**AMERICAN UNION TRANSPORT, Inc.,**
Petitioner,

v.

**UNITED STATES of America and Federal Maritime Board, Respondents,**

**River Plate and Brazil Conferences, et al.,**
Intervenors.

No. 13866.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 24, 1958.

Decided April 24, 1958.

Certiorari Denied Oct. 13, 1958.

See 79 S.Ct. 46.

Mr. George F. Galland, Washington, D. C., with whom Mr. William J. Lippman, Washington, D. C., was on the brief, for petitioner.

Mr. Edward Aptaker, Chief, Regulations Branch, Federal Maritime Bd., with whom Messrs. Robert E. Mitchell, Asst. Gen. Counsel, Federal Maritime Bd., and Daniel M. Friedman, Atty., Dept. of Justice, were on the brief, for respondents.

Mr. Elmer C. Maddy, Washington, D. C., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Robert E. Kline, Jr., Washington, D. C., was on the brief, for intervenors. Mr. Ronald A. Capone, Washington, D. C., also entered an appearance for intervenors.

Before DANAHER, BASTIAN and BUR-GER, Circuit Judges.

BASTIAN, *Circuit Judge.*

This is a proceeding to review an order of the Federal Maritime Board (hereinafter referred to as the Board). The order under review denied petitioner reparations for an alleged violation of § 15 of the Shipping Act of 1916.[1]

Petitioner, American Union Transport, Inc. (hereinafter referred to as AUT), is a registered freight forwarder, broker, owner and charterer of vessels, and a water carrier. River Plate and Brazil Conferences (hereinafter referred to as the Conference) is a group of steamship lines, common carriers by water between certain ports of the United States and Canada and ports in South America, including Brazil. The Conference operates pursuant to a certain agreement on file with and approved by the Board, and certain parts of that agreement, important

---

1. The provisions of §§ 15 and 16 of the Shipping Act of 1916, 46 U.S.C.A. §§ 814, 815 are attached hereto as an appendix.

to a consideration of this case, will be hereinafter referred to. The agreement gives the Conference power to make rates, including brokerage,[2] subject to approval of the Board. AUT is not a member of the Conference.

Sometime in 1952 the Estrado de Ferro Central do Brazil (hereinafter called Central), an instrumentality of the Government of Brazil, purchased 120 locomotives and certain parts from American and Canadian companies. The Conference interested itself in obtaining carriage of these locomotives on Conference vessels, as did AUT. AUT's quotation was the high one and it did not get the business as a carrier, but the Conference did. Thereafter, on May 16, 1952, AUT was advised by Central that the ocean transport of the locomotives had been entrusted to Lloyd Brasileiro (hereinafter referred to as Lloyd), a steamship line member of the Conference and, like Central, an instrumentality of the Brazilian Government, and at the prices quoted by the Conference. Central's letter to AUT also contained the following language:

"Likewise it was decided to appoint American Union Transport, Inc. as brokers in charge of negotiations and arrangements in connection with these shipments by Lloyd Brasileiro or another member of the Conference, without any charge to Central.

"I already advised Lloyd Brasileiro of this appointment in my letter of May 14th and am today sending correspondence to the same

effect to the manufacturers—General Electric, Baldwin-Lima-Hamilton Corporation and Montreal Locomotive Works Ltd.

"The Central will undertake to sign the freight contract directly with Lloyd Brasileiro, but would request your cooperation in drawing up the essential clauses in contracts of that nature."

Central also notified at least one of the Conference lines of the designation.

On June 11, 1952, AUT notified Lloyd that the first two locomotives would be ready on a date specified, and advised Lloyd that "brokerage will be due us at the rate of 1¼% of the freight." Upon receipt of this letter Lloyd advised AUT that the claimed brokerage would not be paid for the reason that both Central and Lloyd were departments of the Government of Brazil and were not permitted to pay brokerage on shipments consigned to Brazilian Government departments.

On June 11, 1952, the Chairman of the Conference called a special joint executive meeting thereof to be held on June 12 to determine whether or not brokerage should be paid to AUT, and this notice contained, among others, the following statement:

"In view of the fact that the American Union Transport Company and/or its associates negotiated for these locomotives as a competitor carrier, underquoting existing Conference rates, forcing the Conference

2. The brokerage may be paid by Conference members in accordance with the following rules adopted pursuant to the basic agreements.

"Rule 10 of the Conference Tariff No. 11: *Brokerage.* Freight brokerage not to exceed 1¼% of the amount of freight may be allowed only to bona fide brokers whose actual business shall be brokerage and freight between ocean carriers and general shipping public; a broker whose business is maintained directly or indirectly by a shipper or consignee for the purpose of handling his business exclusively shall not be deemed a bona fide broker; freight brokerage shall be paid only on the following understanding which shall be written or stamped on all brokerage bills:

" 'In compliance with Section 16 of the Shipping Act, 1916, payment by the carrier and the acceptance of freight brokerage by the broker are on the strict understanding that no part of the brokerage shall revert to the shipper or consignee, and that the business of the broker is in no sense subsidiary to that of the shipper or consignee.'

"Note:—At Canadian Ports 'In compliance with Section 16 of the Shipping Act, 1916' shall be deleted."

to markedly reduce its rates to secure this business, it is believed by several lines that even though they have been appointed freight forwarders by the Central Railroad of Brazil, they are performing no service whatsoever for our member lines and therefore are not entitled to brokerage."

The minutes of this specially called meeting show that the following action was taken:

"After discussion it was proposed that no brokerage be paid on the 120 Locomotives closed direct in Brazil with the Central Railroad of Brazil by Conference representatives, and on ballot vote the proposal was approved.

"On motion, seconded and carried, meeting thereupon adjourned."

AUT continued to render services as a freight forwarder, that is, handling bills of lading, and did other acts usually performed by a freight forwarder rather than by a broker. AUT claims that it was not advised of the Conference action until October 1952,[3] when its bills to Moore-McCormack Lines were returned to AUT unpaid, with the explanation that the line could not pay due to the Conference action of June 12, 1952. However, the witness Holzer, representing AUT, testified that his company learned of the Conference action shortly after it took place, some time in June 1952. Holzer also testified:

"Q. So you were under no illusion that members of the Conference could not pay you brokerage on these locomotives under the Conference action? A. We felt that this action was completely unjustified, and we notified the lines that we would not accept the denial of brokerage.

"Q. But you went ahead and acted, knowing the Conference had taken this action? A. Certainly, we had undertaken to handle this business entrusted to us by a very important client, namely, Estrada, and even though perhaps the Conference wanted us to drop it, we couldn't do that because they saw fit not to pay us brokerage. But we went on record that we would demand it.

"Q. So you went ahead with this business because you felt you had an obligation to the Central Railroad who had appointed you? A. Yes, we had an obligation. We had undertaken to handle these 120 locomotives."

Section 15 of the Shipping Act is in fact the antitrust law for the shipping industry and no action taken by the Conference which in any way savors of what would be a violation of the Sherman Anti-trust Act, 15 U.S.C.A. § 1 et seq., is proper. However, certain actions may be taken in concert by members of the Conference, if approved by the Board.

The agreement of June 12, 1952, was never filed with the Board for approval (although the minutes of the meeting were filed with the Board); and the claim of AUT is that it was therefore an invalid and unlawful agreement and in violation of § 15.

In 1954, before the present proceedings were instituted, a federal antitrust suit was filed by AUT in the United States District Court for the Southern District of New York on the ground that the action taken by the Conference on June 12, 1952, was a violation of the Sherman Act. The Conference and its member lines, and the Board, moved to dismiss this antitrust suit on the ground that the claim was within the exclusive juris-

3. AUT was advised by Lloyd, which carried the great bulk of the freight, on June 12, 1952, that the so-called brokerage attemped to be charged would not be paid by Lloyd on any shipments since this would mean that the Brazilian Government would be paying brokerage on shipments "they would normally handle as they have been handled in the past." There is no evidence justifying the claim that Lloyd as a matter of fact took this action as a result of the June 12, 1952, meeting. In fact the evidence is to the contrary.

diction of the Board. The motions to dismiss were granted on the ground stated and the complaint dismissed, 126 F.Supp. 91. On appeal to the Circuit Court of Appeals for the Second Circuit, this decision was affirmed. American Union Transport v. River Plate and Brazil Conferences, 2 Cir., 1955, 222 F.2d 369.

On June 14, 1954, under § 22 of the Shipping Act, 46 U.S.C.A. § 821, proceedings were instituted before the Board by AUT asking that the Conference agreement of June 12, 1952, be declared unlawful because it was neither filed with nor approved by the Board, and asking reparations in the amount of $11,647.11, being the amount of the brokerage allegedly denied AUT as a result of the June 12, 1952, action. In answer the Conference contended, among other things, that § 15 of the Act had not been violated;[4] that brokerage was not in fact earned; that, as AUT had performed no service for the Conference, and had competed with the Conference for the business, it was obvious that it was not entitled to brokerage from a member of the Conference; and, further, that the Board had no jurisdiction over shipments from Canada.

The matter was referred to an examiner, who in due course held the charges to be sustained, and recommended reparations or damages in the amount of $7,330.41, being the amount which would have been due under the 1¼% brokerage formula approved in the Conference agreement[5] insofar as shipments moving from American ports were concerned, but denied reparations insofar as shipments from Canadian ports were concerned. The examiner also recommended that the fact of the violation of § 15 of the Act "be certified to the Department of Justice for institution of appropriate proceedings."

Exceptions to the examiner's report were duly filed on behalf of both AUT and the Conference and, after further proceedings, the Board held that there was a violation of § 15 of the Act insofar as the action of June 12, 1952, was concerned, as that action constituted an agreement required to be filed for approval. The Board held, however, that notwithstanding this violation AUT could not collect brokerage, because to do so would violate § 16 of the Act in that the waiving of a freight forwarding fee from the consignee and the collection thereof from the carrier under the guise of brokerage would be an indirect rebate to the consignee to the extent that the brokerage payment included the cost of the freight forwarding services and was therefore an "unjust or unfair device or means." The Board also held that, apart from the indirect rebate, *brokerage* had not been earned. Brokerage, the Board held, has been defined as securing cargo for the ship.

The Board also announced in its Report and Decision that since it was desirable that a more definitive guide be established whereby Conferences may readily distinguish between routine agreements which need not be filed with the Board and those which require specific approval under § 15, a rule-making proceeding for the definition of status in such field would be initiated. It also ruled that in view of the want of clarity in prior Board decisions pertaining to both the requirement of filing of agreements under § 15 and the waiving of freight forwarding fees where brokerage is to be collected, it would not take any action against any of the parties aimed at the collection of penalties provided for in §§ 15 and 16 of the Act.

Thereupon, the present petition for review was filed by AUT, asking that the Board's order be set aside and that this

---

4. Section 7 of the Conference agreement provides that the Conference at any meeting may pass upon the "ordinary routine business of the Conference," and upon any matter involving, among other things, "brokerages."

5. Section 4 of the Conference agreement provides: "No freight brokerage shall be paid in excess of one and one-quarter percent (1¼%) on the amount of freight paid in accordance with the tariff."

court direct the Board to modify its order, or to enter a new order directing the payment of reparations to AUT in the full amount demanded by it. The Conference and its member companies have intervened.

We consider the question of whether the payment of so-called brokerage under the circumstances of this case would have violated § 16 of the Act. The Board took the position that AUT performed no services as a broker but did perform freight forwarding services for the *consignee* without compensation therefor, intending, instead, to rely upon brokerage from the carriers for its compensation. The Board held that under this arrangement the consignee would have had property transported at less than the rate of the transportation therefor together with the cost of the incidental services in connection therewith. The Board also held that the waiving of a freight forwarding fee from the consignee and the collection thereof from the carrier under the guise of brokerage would be an indirect rebate to the consignee to the extent that the brokerage fee included the cost of the freight forwarding services, and therefore constituted an unjust or unfair device or means in violation of § 16, particularly as here there had been no brokerage services as such performed by AUT.

■ It is perfectly obvious that AUT performed no services as a broker in the ordinary sense of the term "broker," i.e., securing cargo. Far from obtaining the cargo for the Conference, AUT was in direct conflict with the Conference, and under no stretch of the imagination could it be said that AUT earned any compensation whatsoever as a broker. AUT, however, contends that, under the rather broad meaning given to the word "broker" in previous cases, that term includes "freight forwarder." It is doubtless true that, where brokerage has been earned, the broker very frequently has performed freight forwarding services as well, and without additional compensation. In this case, however, except in a few minor details, the services rendered inured not to the benefit of the carrier but to the benefit of the consignee, and, to that extent the Board was correct in holding that the consignee benefited and that a rebate in effect resulted.

■ We have no reason to disagree with the Board's holding that, of all the services performed by AUT in connection with the shipments (arranging overland transportation to shipside, coordinating manufacturers' delivery dates with steamer sailings, procuring consular invoices, customs declarations and export permits, reserving space, booking the cargo, preparing bills of lading, and advising Central when to expect shipments), only the preparing of bills of lading might be construed to be the performance of an obligation which is that of a carrier, and that that duty on the carrier arises only after the shipper, or his agent, supplies the carrier with a complete description of the goods to be shipped.

It seems clear, as the Board held, that the other functions performed by AUT could not be said to be functions which, in the absence of AUT's performing them, would be performed by the carriers, and that the duty to bring the locomotives alongside the vessel ready for shipment is a duty of the shipper, not of the ship, and was ordinary freight forwarder service.

■ We believe that this determination by the Board was a matter committed to it as an expert in the field and that this court should not pit its view against that of the Board. The great complexity of our economy induced Congress to place the regulation of businesses like foreign shipments in specialized agencies with broad powers. The courts are slow to interfere with the conclusions of such agencies when reconcilable with statutory directions. See United States v. Storer Broadcasting Co., 1956, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081; Unemployment Compensation Comm. of territory of Alaska v. Aragan, 1946, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136.

We think the conclusions of the Board in this case are reconcilable with the statutory directions. Certainly it is true that the Board should have authority to distinguish between the services of a broker and those of a freight forwarder and find that, under the circumstances of this case, § 16 had been violated.

██ The appointment of AUT as a broker by Central could not create any liability on the part of the ocean carriers. There was no agreement by the carriers authorizing the appointment, and certainly no agreement by the members of the Conference to incur liability to AUT, with whom it had engaged in competition for the very business for which it now claims compensation by way of reparations. AUT was not the broker for the carriers to obtain the contract and there was no agreement at any time between AUT and the members of the Conference to pay brokerage. Everything is to the contrary and AUT was promptly put on notice that the carriers would not pay. Nevertheless, having this notice, AUT elected to proceed. It did so at its own risk. It seems clear also that the selection of the carriers was made by Central and not AUT, as Central reserved the right to designate the carrier.

██ Even if it be true that the Conference has heretofore paid brokerage wherever the broker forwarder was "identified with the cargo," no reason exists why the Board, under its broad power, should not have authority to distinguish between the services of a broker and those of a freight forwarder.[6] We therefore hold that the Board committed no error in holding that no reparations were payable to AUT under the circumstances of this case.

Obviously, even in the case of a violation of § 15, injury must be shown before a recovery can be had; AUT having had no right to brokerage, it suffered no damage by the action complained of.

The above disposition of the case makes it unnecessary to reach the question of jurisdiction of the Board over shipments originating in Canada.

██ We are of opinion also that there is no merit in appellant's claim that the Board's decision and order are procedurally invalid. If the Board held, as it did, that the collection of brokerage, so-called, under the circumstances of this case, would violate § 16, the Board would not be precluded from disallowing compensation for an illegal act, whether the question was specifically raised or not. In addition, we are unable to say that the issue in question was not called to the attention of the Board.

The order of the Federal Maritime Board is

Affirmed.

### Appendix

#### Shipping Act of 1916

Sec. 15 (now 46 U.S.C.A. § 814). Every common carrier by water, or other person subject to this chapter, shall file immediately with the Federal Maritime Board a true copy, or, if oral, a true and complete memorandum, of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or

---

6. It seems perfectly clear, as held by both the examiner and the Board, that the action of the Conference at the June 12, 1952, meeting, without its submission to and approval by the Board, was a violation of § 15 of the Act. The Conference vote, it may plausibly be argued, reflected an agreement designed to punish AUT for its action in bidding against the Conference. The Conference members, prior to the June 12, 1952, meeting, had paid brokerage to forwarder-brokers where such persons had been merely "identified with the cargo," and the action of that date was obviously a modification of an existing agreement and required under § 15 to be filed with the Board for approval before becoming effective. See Pacific Westbound Conference v. Leval & Co., 1954, 201 Or. 390, 269 P.2d 541.

destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.

· The Board may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations.

Agreements existing at the time of the organization of the Board shall be lawful until disapproved by the Board. It shall be unlawful to carry out any agreement or any portion thereof disapproved by the Board.

All agreements, modifications, or cancellations made after the organization of the Board shall be lawful only when and as long as approved by the Board, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.

Every agreement, modification, or cancellation lawful under this section shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto.

Whoever violates any provision of this section shall be liable to a penalty of $1,000 for each day such violation continues, to be recovered by the United States in a civil action.

Sec. 16. (now 46 U.S.C.A. § 815). It shall be unlawful for any shipper, consignor, consignee, forwarder, broker, or other person, or any officer, agent, or employee thereof, knowingly and willfully, directly or indirectly, by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means to obtain or attempt to obtain transportation by water for property at less than the rates or charges which would otherwise be applicable.

It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—

First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

Second. To allow any person to obtain transportation for property at less than the regular rates or charges then established and enforced on the line of such carrier by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means.

Third. To induce, persuade, or otherwise influence any marine insurance company or underwriter, or agent thereof, not to give a competing carrier by water as favorable a rate of insurance on vessel or cargo, having due regard to the class of vessel or cargo, as is granted to such carrier or other person subject to this chapter.

Whoever violates any provision of this section shall be guilty of a misdemeanor punishable by a fine of not more than $5,000 for each offense.