**ANGLO–CANADIAN SHIPPING COMPANY LIMITED, Canadian Occidental Shipping Co., Ltd., et al., Petitioners,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents.**

No. 17787.

United States Court of Appeals Ninth Circuit.

Aug. 20, 1962.

Rehearings Denied Nov. 2, 1962.

Graham, James & Rolph, Leonard G. James, and Robert L. Harmon, San Francisco, Cal., for petitioners.

Lee Loevinger, Asst. Atty. Gen., Antitrust Division, Richard A. Solomon, Atty., Dept. of Justice, James L. Pimper, Gen. Counsel, Robert E. Mitchell, Deputy Gen. Counsel, and Thomas D. Wilcox, Atty., Federal Maritime Commission, Washington, D. C., for respondents.

Gerald H. Ullman, New York City, for intervenor, New York Foreign Freight Forwarders and Brokers Ass'n, Inc.

Dorr, Cooper & Hays, San Francisco, Cal., and John Tilney Carpenter, New York City, for intervenor States Marine Lines, Inc.

J. Richard Townsend, San Francisco, Cal., for intervenor Pacific Coast Customs and Freight Brokers Ass'n.

Herman Goldman and Elkan Turk, New York City, and J. Richard Townsend, San Francisco, Cal., for intervenor Customs Brokers and Forwarders Ass'n of America, Inc.

Orrick, Dahlquist, Herrington & Sutcliffe, George Herrington, Christopher M. Jenks, and Robert Keller, III, San Francisco, Cal., for intervenors Port of New York Authority, City of New York, and State of New York.

Leo A. Larkin, Corp. Counsel, Samuel Mandell and Sidney Brandes, Asst. Corp. Counsel, New York City, for intervenors City of New York.

Sidney Goldstein, General Counsel, F. A. Mulhern, New York City, Arthur L. Winn, Jr., Samuel H. Moermann, J. Raymond Clark, Burton Fuller, and James M. Henderson, Washington, D. C., for intervenors Port of N. Y. Authority.

Louis J. Lefkowitz, Atty. Gen. of New York, New York City, and J. Bruce MacDonald, Albany, of counsel, for intervenors Dept. of Commerce, State of New York.

Before CHAMBERS, POPE and JERTBERG, Circuit Judges.

POPE, Circuit Judge.

This matter is here upon the petition of the Pacific Coast European Conference and its several shipping lines and shipowning members, seeking review of an order of the Federal Maritime Commission dated January 18, 1962, wherein and whereby the respondent Commission concluded, found and ordered that "agreements between common carriers by water in the export foreign commerce which prohibit brokerage or limit the amount thereof to less than $1\frac{1}{4}\%$ of freight charges, operate to the detriment of the commerce of the United States, and are contrary to the public interest, in violation of § 15 of the Shipping Act, 1916, as amended." It was ordered that all conferences of the common carriers by water in the outborne trades in foreign commerce of the United States, including the Pacific Coast European Conference, are "required to conform their brokerage practices to this ruling."

The order in question was entered in a proceeding instituted by the Commission referred to as Docket No. 831 in which numerous conferences, including the one here petitioning, were made respondents. It was ordered that all conferences, including Pacific Coast European Conference, "shall prior to March 23, 1962, modify their conference agreements, regulations and tariffs, so as to eliminate therefrom any provisions which are not in compliance with the findings and conclusions" quoted above.

The background of this case goes back a good many years. It has to do with the payment of brokerage fees to freight forwarders. Numbers of freight forwarding organizations and persons interested in or allied with them have intervened in this proceeding. We shall not undertake to describe at length the nature and functions of freight forwarders; that subject is discussed at length by Prof. John J. Frederick, Professor of Transportation at the University of Maryland in the book entitled "Ocean Transportation", McGraw-Hill Book Co., 1954, pp. 145 to 155. We assume the readers of this opinion have some familiarity with that business.

Primarily the freight forwarder prepares, processes and generally attends to the necessary shipping papers in connection with export ocean transportation, a function which he performs especially

for the shipper. The freight forwarder looks after the booking of or arranging for cargo space for export shipments on ocean carriers, and performs a number of the other related functions including clearance of export shipments under government regulations and procuring certification of consular documents. Customarily also, when the freight forwarder books space on a vessel for a particular shipment, although he does so as an agent for the shipper, he generally collects freight brokerage from the carrier. Traditionally this has amounted to 1¼% of the freight charges.

The particular controversy which this case brings here has to do with a certain Rule 21 which is a part of the Pacific Coast European Conference traffic agreement. Copy of that Rule is set forth in the margin.[1] It will be noted that through the adoption of this rule the members of the Pacific Coast European Conference have prohibited payment of brokerage exceeding certain stated percentages and in some cases have prohibited the payment of brokerage altogether. Thus Rule 21 is in violation of the Commission's order in respect to all those items which are specially listed as calling for something less than 1¼%.

At all times here mentioned § 15 of the Shipping Act, (46 U.S.C.A. § 814), to and including its amendment on October 3, 1961, by Public Law 87–346, § 2, 75 Stat. 763, has provided that common carriers by water, are required to file with the Commission, (or with its prede-

---

1. "Pacific Coast European Conference Tariff No. 13—General Rules Section— 21. FREIGHT BROKERAGE. Member lines are permitted to pay brokerage ONLY to firms whose names appear on the Conference's list of Approved Freight Brokers.

"It is understood that there is no legal obligation on the part of member lines to pay brokerage, commission or fee of any kind in connection with freight booking.

"Any brokerage payable shall be on the basis of the applicable rate from PACIFIC COAST port of loading to port of discharge only. Brokerage may be paid as herein provided on shipments moving under through bills of lading to post-terminal ports as provided under the 'Transshipment Section', except that it may not be paid on the arbitraries shown in said section.

"No brokerage may be paid ABROAD, nor on Heavy Lift or Extra Length Charges, nor on cargo covered by bills of lading showing as shipper a broker's name followed merely by the words 'as agent(s)', e. g., 'John Smith Forwarding Company, as agent'.

"Payment of brokerage shall not exceed:

On Grain, in bulk or in bags,
On Grain Products,
On Flour, viz., Barley, Corn, Rye or Wheat,) } ¾%

On all commodities named in 'Lumber Section' of this Tariff, 1%

On Open Rate Commodities NOS. 1%

On 'NET RATE' CARGO, viz., No brokerage payable.
Airplanes
Airplane Parts
Borates, Crude or Refined
Brick, Infusorial Earth
Citrus Fruit, under refrigeration
Cotton and Cotton Linters
Earth, Diatomaceous or Infusorial
Fish, frozen
Lead, viz. Bars, Billets Pigs or Slabs
Plywood, Douglas Fir
Refrigerator Equipment as shown in tariff item so named
Salmon, Hard Salt or Mild Cured, under refrigeration
Soda Ash
Zinc, viz., Bars, Blocks, Ingots, Pigs or Slabs
On all other Cargo 1¼%

"The following clauses must appear on brokerage invoices before payment may be made:

" 'In compliance with Section 16 of the United States Shipping Act of 1916, payment by the carrier and acceptance of freight brokerage by the Broker are on the strict understanding that no part of the brokerage shall revert to the shipper or consignee, and that the business of the Broker is in no sense subsidiary to that of the shipper or consignee.'

" 'The undersigned certifies that it is a registered freight forwarder pursuant to Federal Maritime Commission General Order No. 72, and has performed the required services specified in § 44(e) of the Shipping Act, 1916, as amended.' "

cessor Board or Commission), copies of every agreement with other carriers by water, and the section provides that the Commission shall by order after notice and hearing, disapprove, cancel, or modify any agreement, whether or not previously approved by it, that it finds "to operate to the detriment of the commerce of the United States."

The order here in question was purportedly issued pursuant to the provision just referred to, and upon the basis of a finding that concerted action by a group of carriers in the nature of Rule 21 above referred to, did operate to the detriment of the commerce of the United States. The emphasis here must be placed upon the word "concerted". The parties here agree that there is no law, rule or regulation which requires an individual carrier to pay brokerage to any one.[2]

On April 1, 1947, the predecessor Maritime Commission undertook an investigation involving public hearings with respect to the payment and non-payment of brokerage by carriers. Some 21 outbound conferences and their member lines were made respondents. For some reason which is not clear, perhaps because of oversight, the presently petitioning Conference was not made a respondent. In these proceedings it appeared that these conferences in their basic conference agreements prohibited the payment of brokerage to forwarders. The Commission found that "concerted prohibition against the payment of brokerage results in detriment to the commerce of the United States in that it

has had and will have a serious effect upon the forwarding industry."

It would appear that behind this finding was the view of the Commission that freight forwarders must be able to collect such brokerage in order to be able to stay in business in that compensation collected from the shippers alone was inadequate to support them. The hearing resulted in an order that the respondents should remove prohibitions against the payment of any brokerage from their conference agreements. This order was attacked by certain of the respondent conferences in Atlantic & Gulf/West Coast, etc. v. United States, D.C., 94 F. Supp. 138, heard by a three-judge district court in the Southern District of New York and the order was affirmed.

The order therein reviewed dealt solely with agreements not to pay *any* brokerage. However, the Commission added a dictum as follows: (p. 141, 94 F.Supp.) "On the other hand, as we have found that a prohibition against any payment of brokerage results in detriment to the commerce of the United States, we believe that any limitation below 1¼% of the freight involved, which is the amount generally paid by carriers in the various trades over a period of years, would circumvent our finding, and result in the detriment condemned."

The reviewing court noted that this was a dictum and carefully refrained from expressing any view as to whether the Commission could validly prohibit agreements to pay brokerage at a rate less than 1¼%.[3] The same order re-

---

**2.** Some of the briefs suggest that there is a practical compulsion upon an individual carrier to pay brokerage. Since in practice the forwarder often selects the ship on which cargo space is arranged for, the suggestion is that a carrier who failed to pay the customary brokerage to a forwarder would find little demand for his cargo space. This undoubtedly explains the practical reason for the concerted adoption of a rule like Rule 21 to which all members of the Conference are required to conform.

**3.** (D.C., 94 F.Supp. p. 142): "The Commission's order directs merely that plain-

tiffs' agreements not to pay brokerage be eliminated. Individual carriers are left free, subject to their own judgment and the ordinary operation of lawful competition, to pay or not to pay. The Commission's report did not go so far as to state that all agreements relating to the payment of brokerage would be disapproved, although it considered that an agreement to pay less than 1¼ percent would perpetuate the condemned detriment. Payment of brokerage is not compelled. No more is done than to subject the carriers to normal competitive conditions. It would thus be premature for

viewed in that case was also reviewed on the petition of certain other conferences by a three-judge district court in the Northern District of California in Pacific Westbound Conference v. United States, D.C., 94 F.Supp. 649. That court approved the decision of the district court for the Southern District of New York, above referred to, and denied relief against the order of the Commission.

Subsequently the successor Federal Maritime Board in a proceeding entitled The Joint Committee of Foreign Freight Forwarders v. Pacific Westbound Conference, Docket Nos. 718 and 719, had before it that Conference's Rule 30(b) which limited conference members to the payment to qualified forwarders of brokerage not in excess of certain stated amounts, less than 1¼%. For instance, on certain products the brokerage was limited to ¾% and on other commodities to 10 cents per ton. In this case, decided March 24, 1953, the Board, relying on the Commission's dictum in the proceedings previously mentioned, and calling it a "fundamental ruling" invalidated the provisions of Rule 30(b) and thereby actually decided that a limitation of brokerage rates to less than 1¼% was invalid.[4] Thereafter, in a proceeding instituted October 22, 1954, in which the presently petitioning Pacific Coast European Conference was the respondent, the Board had before it for consideration the then Rule 21 of that Conference which contained not only the present provisions limiting brokerage on certain commodities to less than 1¼%, but also a provision requiring member lines to refuse to pay brokerage to any broker who solicits and receives brokerage from a nonconference competitor. The latter provision was held to be invalid and ordered eliminated from the Rule. The Board

then proceeded to consider the question of the validity of the prohibitions of Rule 21 on the payment of brokerage and limitations on payment to less than 1¼%.

In this connection the Board rather sharply modified some of the statements made in the preceding matter, namely, that relating to Pacific Westbound Conference and its Rule 30(b). Commenting upon that proceeding the Board stated that it had made the ruling relating to Rule 30(b) "relying on its findings and conclusions in Docket No. 657, *without any finding of actual detriment to the commerce of the United States by the particular prohibitions therein considered.*" (Emphasis ours) The Board went on to say (p. 235): "In the instant proceeding the record does not show and will not support a finding, that the particular prohibitions and limitations below 1¼% on payment of brokerage contained in Rule 21, by themselves and without reference to brokerage practices which might be followed by other conferences, have seriously affected the forwarding industry or been detrimental to the commerce of the United States." It also said (p. 237): "On the limited record developed, however, we are unable to make findings and reach conclusions which would modify or overrule the decisions in Docket Nos. 657 and 718, 719."

The Board expressly recognized that the conditions which led to its dictum in the earlier case "may not generally be true today". It stated that it would institute a general investigation into all brokerage and forwarding activities and practices. It said (p. 237): "There is no showing in this record that these particular prohibitions and limitations actually have resulted in specific detriment to the commerce of the United States, or

---

us to consider whether the Commission could validly order the payment of brokerage and whether the designation of 1¼ percent as the minimum rate for agreements is justified. The order is silent on these subjects, and brokerage payments and the 1¼ percent minimum may never be prescribed."

4. What the Board actually said was that "limiting brokerage rates to less than 1¼% of the ocean freight involved [is] in violation of the Commission's order in Docket No. 657." As we have noted, this cannot be true, but the decision permits an inference that it was ruled that a conference agreement so limiting brokerage was detrimental to commerce.

that any such detriment is now threatened. In fact, the record shows that these particular prohibitions and limitations apply to relatively few commodities and do not, by themselves, vitally affect the forwarding industry."

It seems clear that at this time the Board expressly recognized that the earlier statement as to limitations below a 1¼% was in fact dictum, and that up to that date there had been no finding that a limitation of payment of brokerage to less than 1¼% would operate to the detriment of the commerce of the United States.

This tendency of the Maritime Board to wobble upon these questions became even more apparent when the Board proceeded to carry on its promised general investigation of practices, operations, etc. of ocean freight forwarders and of practices and agreements of common carriers by water in connection with payment of brokerage to freight forwarders. This general investigation was carried on under two docket numbers: No. 765 and No. 831, the former referring to freight forwarders and the latter to payment of brokerage by water carriers. No. 831 was instituted by notice dated January 10, 1958, (see Fed.Reg. Vol. 23, No. 10, p. 278, Jan. 15, 1958). All conferences of carriers by water in the outbound trade in foreign commerce of the United States, including the present petitioner, were made respondents. That proceeding which was consolidated with docket No. 765, resulted in a decision of the Board dated June 29, 1961.

The upshot of the lengthy hearing held by the Board was that the forwarders had been found guilty of various improper and unreasonable practices in relation to their charges and in making indirect rebates to shippers out of brokerage received, and the Board was of the view generally that the proper solution of the whole matter would be to provide more strict regulation of forwarders, require the forwarders to collect all their compensation from the shippers, and prohibit the payment of any brokerage to any forwarder. The Board took back all of the findings previously made by itself and by the predecessor Commission in the following finding: "That the findings in the prior decisions cited in the order of Docket 831, to the effect that agreements between common carriers by water subject to the Act prohibiting the payment of brokerage, or limiting the payment of brokerage to less than 1¼ percent of freight charges, are or would be detrimental to the commerce of the United States in violation of section 15 of the Act, are no longer valid orders and the proceedings cited carrying such findings into effect will no longer be considered effective."

About the time that this ruling was handed down the forwarders, who doubtless were disappointed by this decision, took their case to Congress. The result there was the Act of September 19, 1961, Public Law 87–254, 75 Stat. 522, 46 U.S.C.A. § 841b, which provided for a system of licensing and regulating the business of forwarders, and also contained a provision stating that "a common carrier by water may compensate a person carrying on the business of forwarding to the extent of the value rendered such carrier in connection with any shipment dispatched on behalf of others when, and only when, such person is licensed hereunder and has performed with respect to such shipment" certain listed functions and duties with respect to the shipment. As this congressional enactment obviously put an end to the Board's proposal to stop payments of brokerage, the Board of course found it necessary to grant applications for reconsideration of its report and to cancel the order made thereon. By this time the present Commission had succeeded the Board and it reopened its Docket No. 831. On November 16, 1961, the Commission called for further proceedings in No. 831 in the following order: "IT IS ORDERED, that interested parties file briefs with the Commission on or before the close of business on December 5, 1961, directed solely to the issue of whether agreements between common carriers subject to the Shipping Act, 1916, prohibiting the pay-

ment of brokerage, or limiting the payment of brokerage to less than 1¼% of freight charges are, or would be in violation of said Act, as amended."

Briefs were filed by the parties including the present petitioning Conference and oral argument was heard. It is to be noted that the order quoted, which is the only notice given of further hearing, made no provision for the production or taking of testimony or the receipt of other evidence.

The Commission conceded that the statute above quoted relating to the payment of brokerage to forwarders was permissive only; it had no bearing upon the basic question whether or not the provisions of Rule 21 would operate to the detriment of the commerce of the United States. Petitioner asserts that the notice was insufficient to inform it that its Rule 21 was to be questioned on that ground; it says that it understood from the order made that the only issue in the further proceedings was whether the 1961 amendment to the Shipping Act had some bearing upon the validity of the brokerage limitations. We doubt if that position is well taken but we find it unnecessary to question the proceedings on that ground in view of our conclusions hereafter stated.

What the Commission then proceeded to do was to review its earlier decisions which we have described above, and particularly the one which was reviewed in Atlantic & Gulf West Coast of Central America, etc. v. United States, supra, and Pacific Westbound Conference v. United States, supra. It noted that the earlier holdings were based upon the Board's determination that the forwarding industry makes a valuable contribution and is essential to the United States commerce; that a "considerable portion of its revenue is derived from brokerage; and that it is detrimental to commerce to allow concerted carrier action that would, in its ultimate overall effect, seriously impair the function of the industry by depriving it of such revenue." The Commission then held and found as follows: "We conclude and find on this record that

agreements between common carriers by water in the export foreign commerce which prohibit brokerage or limit the amount thereof to less than 1¼% of freight charges, operate to the detriment of the commerce of the United States and are contrary to the public interest, in violation of section 15 of the Shipping Act, 1916, as amended." In substance, what the Commission held was that it would adhere to the dictum indicated above in the earlier Commission decision.

We would find no difficulty in agreeing with what the Commission actually held in the decision first quoted above, namely, that a complete prohibition of payment of brokerage would properly be found to operate to the detriment of the commerce of the United States. The Commission's reasoning was as follows: freight forwarders constitute an important sector and perform an important function in promoting the foreign commerce of the United States; freight forwarders have traditionally procured a portion of their income from brokerage; if they were completely deprived of the opportunity to collect brokerage, their income would be seriously affected and so would their chances of survival; accordingly, to prohibit any brokerage by concerted action or agreement would operate to the detriment of the commerce of the United States. All that seems plain enough.

But when we come to the specific provisions of Rule 21, which are in issue in this particular case, we find considerable difficulty. As we have noted in the earlier decision of the predecessor Board, issued in the proceedings instituted October 22, 1954, against Pacific Coast European Conference as respondent, the Board found that in that proceeding "the record does not show and will not support a finding, that the particular prohibitions and limitations below 1¼% on payment of brokerage contained in Rule 21 * * have seriously affected the forwarding industry or been detrimental to the commerce of the United States."

We have quoted above from that decision and also noted that the Board there,

referring to its earlier proceedings, commented that some of the premises on which the earlier Commission had based its findings "may not generally be true today". The question is what is there in the present record to supply the proof that was declared absent in that earlier proceeding?

What we find lacking here is compliance with those provisions of the Administrative Procedure Act which call for the production of evidence and the making of findings based thereon to support the conclusions of the administrative body. As noted in § 10 of the Administrative Procedure Act, (Title 5 § 1009 (e) (5)), this court as a reviewing court is charged with setting aside agency action "unsupported by substantial evidence" in cases of this kind. See Universal Camera Corp. v. N. L. R. B. Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. This record is barren of any evidence as to just what effect Rule 21 has upon the survival of the freight forwarding industry. How does the Commission know that the brokerage payable under Rule 21 would amount to such an insignificant total as to cripple the freight forwarding industry? Our reading of the final decision of the Commission on this matter indicates to us that the Commission had nothing to go on except an earlier dictum, and one that the earlier Commission or its successors subsequently repudiated.

We recognize that there is some authority holding that findings may be based upon judgment or discretion or policy where the specific facts to support the judgment are not susceptible of proof.[5] But we cannot say that this is that type of case. Rule 21 has been in effect and operation for a good many years. There must be an abundance of available evidence to disclose just how much brokerage has been actually paid under the operation of this Rule. Also available would be evidence as to the average earnings of freight forwarders; how much they need to live on; what their collections are from the shippers, and how much they have to get from brokerage. Does the difference between what the average forwarder receives from the shipper, and what the forwarder needs to survive, exceed the amounts payable and available under the operation of Rule 21?

The record is wholly wanting in any information that might answer these questions, but we think we can take judicial notice that evidence on this subject is obtainable, available, and can be procured.[6] As the Supreme Court has said in matters calling for administrative determinations similar to this one: "There must be a full hearing. There must be evidence adequate to support pertinent and necessary findings of fact." Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288. This requirement of hearing applies to the respondent Commission. Isbrandtsen Co. v. United States, D.C. cir., 211 F.2d 51. Not only was there a want of hearing and evidence, but also a complete failure on the part of the Commission to conform to the requirements of § 8(b) of the Administrative Procedure Act, (Title 5 § 1007(b)), whereby parties are afforded an opportunity to propose findings and to note exceptions to decisions or recommended decisions. See Baltimore & O. R. Co. v. United States, 3 cir., 201 F.2d 795. No part of that section appears to have been taken into consideration by the Commission. As stated in Commonwealth of Puerto Rico v. Federal Maritime Board, 110 U.S.App.D.C. 17, 288 F. 2d 419, "The Administrative Procedure

---

5. See the discussion of such cases in Davis Administrative Law Treatise, § 16.11.

6. It cannot be said that the fact that Rule 21 provides that on some commodities no brokerage may be paid, this rule or a portion of it operates in a manner detrimental to commerce. As we indicate here, the basic question is the impact of the Rule taken as a whole on freight forwarders and their business. And additionally, there is suggestion in the record that some of these "no brokerage" commodities, such as Borax are shipped by sellers who use no forwarder, but arrange shipment through employees on their own staffs. Receipt of evidence might disclose that such is generally true with respect to other listed items.

Act requires all decisions to state not only findings and conclusions, but also 'the reasons or basis therefor, upon all the material issues of fact, law or discretion presented on the record * * *.' Section 8(b) 5 U.S.C.A., Section 1007(b). The Board 'should make the basis of its action reasonably clear.'" See also Sec'y of Agriculture v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015; U. S. v. Chicago M., St. P. & P. R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023; Erie R. Co. v. United States, D.C., 59 F.Supp. 748, D.C., 64 F.Supp. 162.

We hold therefore that we are required by this record to vacate and set aside the order here reviewed in so far as the petitioners here are concerned.

IT IS SO ORDERED and the temporary injunction is made permanent.

### On Petitions for Rehearing

The various parties hereto, other than the petitioners, have filed petitions for rehearing which indicate so much misunderstanding of the import of this court's decision that we deem it appropriate to file this opinion in connection with our action upon these petitions.

The petitions assume that our decision requires the Commission to consider separately the rules of each Conference with respect to the payment of brokerage; and that the Commission was prohibited from issuing an order applicable to all Conferences based on evidence and findings with respect to the forwarding industry generally.[1] There is no basis in the deci-

sion of this court for any such assumption as that made by these petitioners. We know of no reason why the Commission could not proceed simultaneously, as it did in this case, against conferences, or against all persons interested in the proceedings, or likely to be affected thereby. We found no fault with the fact that some sixty conferences were named as respondents in the Commission's proceedings; that circumstance constituted no part of the reasons found by us for our decision.

It is true that we gave particular attention to Rule 21 of the Pacific Coast European Conference, but that was solely because that Conference was the petitioner seeking review. The presentation of its rights in this court necessarily required consideration of Rule 21 since that Conference was the only petitioner here. Obviously it would have been impermissible for the petitioner to argue as to the impact of the Commission's order upon other conferences which had not petitioned for review.

What petitioners have overlooked is the mandatory requirement of § 8(b) of the Administrative Procedure Act, (Title 5, § 1007(b)), which provides among other things as follows: "Prior to each recommended, initial, or tentative decision, or decision upon agency review of the decision of subordinate officers the parties shall be afforded a reasonable opportunity to submit for the consideration of the officers participating in such decisions (1) proposed findings and conclu-

---

1. Thus in one petition an assertion is made as follows: "The effect of the Court's decision is to preclude the Commission from issuing an order applicable to all conferences based on evidence and findings with respect to the forwarding and carrier industries as a whole, and to require it to have a separate hearing every time when a new conference rule is issued prohibiting or so limiting the payment of brokerage, thus resulting in endless proceedings and controversies."

In another petition the following is stated: "The Court erred in concluding that the Federal Maritime Commission's general determination as to the unlawfulness of conference prohibitions and limita-

tions on brokerage was invalid as to the Petitioner conference because of failure to make specific findings with respect to that conference. In dealing with general investigations by administrative agencies, the Supreme Court has held that the requirements of the regulatory statute would be nullified and the administrative agency paralyzed, if, instead of adjudicating comprehensively with respect to the entire administrative problem involved, the agency were obliged to consider each individual situation before reaching its decision. * * *"

Other petitions contained similar complaints.

sions, or (2) exceptions to the decisions or recommended decisions of subordinate officers or to tentative agency decisions, and (3) supporting reasons for such exceptions or proposed findings or conclusions. The record shall show the ruling upon each such finding, conclusion, or exception presented."

The provisions of § 8 are by its terms made applicable "in cases in which a hearing is required to be conducted in conformity with § 1006 of this title." This is such a case.[2] The section last mentioned in turn refers to hearings in cases of adjudication.

Whether the number of respondents in a proceeding for adjudication before the Commission be one or sixty or one thousand there is no exception to the requirement of § 8(b) for findings sufficient to support the Commission's order. Those findings are completely lacking in this record. The cases holding that such findings are essential in an administrative proceeding such as this are legion.[3] The general conclusion stated in the Board's final order and supplemental report, phrased in the language of the statute, does not conform to the requirements of the Administrative Procedure Act, nor does it satisfy the rule respecting the necessity of findings. The requirement of specific, definite and basic findings, other than mere ultimate findings or conclusions, is well settled. Thus in Florida v. United States, 282 U.S. 194, 213, 51 S.Ct. 119, 124, 75 L.Ed. 291, the Court said: "In the paragraph, which

we have quoted, containing the ultimate finding of the Commission with respect to the unjust discrimination caused by the existing intrastate rates as between persons and localities, there is a concluding clause that the intrastate rates result 'in unjust discrimination against interstate commerce.' This general statement in the language of the statute, neither standing alone nor taken in its context, could be regarded as sufficient to support a statewide order from the standpoint of income, in the absence of supporting findings of fact as to the revenue from the traffic in question."[4]

What was said in the Florida case, supra, has become settled doctrine in the federal courts. Thus in Colorado-Wyoming Co. v. Comm'n, 324 U.S. 626, 634, 65 S.Ct. 850, 854, 89 L.Ed. 1235, the Court said: "But we must first know what the 'finding' is before we can give it that conclusive weight. We have repeatedly emphasized the need for clarity and completeness in the basic or essential findings on which administrative orders rest," citing the Florida and other cases.

What the Commission here and apparently counsel for the Commission and for the intervenors, as well, have forgotten is this requirement of basic findings. What this involves was spelled out in clear language in Saginaw Broadcasting Co. v. Federal C. Com'n, 68 App.D.C. 282, 96 F.2d 554, 559. There after noting the necessity for findings of fact by administrative boards, and Commissions, and the reasons for that requirement, the

2. After this case had been first argued before us, we called for additional briefs from the parties upon certain questions propounded by us for answer including the question whether the proceeding before the Commission was instituted as a proceeding for rule making, as contemplated by § 4 of the Administrative Procedure Act, rather than a proceeding for adjudication as contemplated by § 5 of the same Act, (5 U.S.C. § 1004). Supplemental briefs were filed in which all parties unanimously agreed that this was a proceeding for adjudication.

3. Many of them are collected in Davis, Administrative Law Treatise, Chap. 16, §§ 16.01 to 16.14.

4. This decision was alluded to in the later case of United States v. Pierce Auto Lines, 327 U.S. 515, 533, 66 S.Ct. 687, 696, 90 L.Ed. 821: "The court undoubtedly did not mean that there was no finding whatever as to fitness, willingness and ability, for the Commission did make such a finding in the statutory language. What was obviously meant was that such an ultimate finding was not enough, as of course it was not, see Florida v. United States, supra, in the absence of a basic finding to support it; and that there was no such basic finding."

court said: "In discussing the necessary content of findings of fact, it will be helpful to spell out the process which a commission properly follows in reaching a decision. The process necessarily includes at least four parts: (1) evidence must be taken and weighed, both as to its accuracy and credibility; (2) from attentive consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts, usually in the language of the statute, are to be inferred, or not, as the case may be; (4) from this finding the decision will follow by the application of the statutory criterion."[5] See also United States v. Chicago, M. St. P. & P. R. Co., 294 U.S. 499, 510, 55 S.Ct. 462, 79 L.Ed. 1023.

It will be noticed also that § 8(b) of the Administrative Procedure Act requires not only findings, but "supporting reasons" for such findings. These are wholly lacking here. That section also requires that prior to the decision the parties shall be given an opportunity to except to the proposed decision and findings. There is complete absence of any attempt to comply with that requirement here. Indeed, in the light of findings which had previously been made by the examiner and by the Commission in this same matter, the failure to comply in any manner with the requirements of § 8(b) is unaccountable. Just prior to the issuance of the final decision in this case the parties to the proceedings had available to them only the recommended decision of the examiner dated March 7, 1960, and the decision and findings of the Federal Maritime Board dated June 30, 1961.[6] In its previous decision the Board found as follows: "The record has been

5. This case is discussed in a note on "Necessity, form, and contents of express finding of fact to support administrative determinations" in 146 A.L.R. 209, at pp. 220, ff., where it is referred to as a leading case.

6. The recommended decision of the examiner was as follows: "The principal basis for the prior decisions in holding that conference prohibitions against the payment of brokerage, or limiting brokerage to less than 1¼ percent of ocean freight charges, would be detrimental to the commerce of the United States, is found in the finding in Agreements and Practices Re Brokerage, supra, at p. 177 that such conference actions have had and will have a serious effect upon the forwarding industry. This finding can be supported on this record, as urged by the forwarders and a number of other parties, but only if it is assumed that forwarding fees must remain at unremunerative levels with resulting indirect rebates to shippers and general disregard of the requirements of § 16 of the Act prohibiting rebates, discrimination, preference, and prejudice. On the other hand, the unregulated payment of brokerage has resulted in substantial payment by the carriers of unearned brokerage, as disclosed on this record, with consequent unnecessary dissipation of carrier revenues creating upward pressures upon ocean freight charges to the detriment of the commerce of the nation. "In addition the prior decision failed to recognize the true nature of brokerage of the type here involved as voluntary payments, made by the carriers as a competitive device to attract traffic over which the forwarders have control of routing, which the carriers should be free to regulate or prohibit as they see fit, and which should be safeguarded against the continuance and recurrence of the widespread rebating resulting therefrom which this record shows to exist. As seen, the safeguards included in the prior decisions to insure that an individual carrier should be free to pay or not to pay brokerage as it sees fit are generally of no avail, in view of the competitive pressures which prevail in the event that brokerage is paid in any trade. There is in logic no sound reason why carriers acting in concert should be free to limit or regulate competition among themselves by imposing upper limits upon rates of brokerage, but at the same time be prevented from limiting or regulating competition among themselves by prohibiting in its entirety the payment of brokerage in any event, or by limiting the payment of brokerage to any extent they deem desirable. "This record discloses with certainty that brokerage payments lead indirectly, through the forwarder recipients, to undesirable and unlawful practices. It must be concluded, therefore, that the prior findings under reconsideration in No. 831 are no longer valid, and that any orders entered as a result thereof should be vacated and set aside."

searched in vain for any probative evidence indicating that the prohibition of brokerage payments would have any adverse or detrimental effect upon the foreign commerce of the United States, limiting the definition of 'foreign commerce' to the actual movement of goods in the export trades, and the promotion and development of such trades. There are numerous general assertions in the record, by forwarders and others, that if brokerage is eliminated entirely the forwarders will perforce need to increase their charges to shippers in order to recoup the lost revenues, that numerous commodities move in export on which the profit margins are narrow which could not stand the imposition of increased forwarding charges, and that the movement of such commodities would thus be adversely affected. No shipper testimony to this effect was adduced, and the shipper testimony of record, from shippers who perform their own forwarding services and do not receive brokerage, indicates to the contrary."

■ For the Commission, without any attempt whatever to comply with the requirements of § 8(b), to issue its conclusory order of January 23, 1962, merely in the language of the statute, was an egregious error.

■ As noted in the Saginaw case, 96 F.2d at p. 563, the absence of required findings is fatal to the validity of an administrative decision regardless of whether there may be in the record evidence to support proper findings. We were not required therefore to inquire as to what evidence there was which might have supported adequate findings, but we think that the Board was right in its first decision when it said the record

would be searched in vain for any probative evidence indicating that the prohibition of brokerage payments would have an adverse or detrimental effect upon the commerce of the United States.

Some of the forwarding agents' witnesses before the Board testified that they should receive brokerage of 1¼ percent of freight charges. On the other hand, witnesses interested in the steamship lines testified that in their opinion the provisions of the respondent's Rule 21 were reasonable and justifiable.[7]

It would appear that all that the Commission had before it in the record were mere expressions of opinion as to the desirability of various limitations on brokerage. These could hardly form the bases for a finding as to the precise point at which a limitation would be detrimental to the commerce of the United States. It seems to us that there is a complete absence of any evidence which would show that harm begins at limitations below 1¼ percent rather than say 1⅛ percent or 1 percent or ⅞ percent or ¾ percent.

It is true that 1¼ percent had been paid customarily for many years but that proves nothing for as the examiner and the Board itself pointed out, the payment was not generally speaking for services rendered, but rather "as voluntary payments, made by the carriers as a competitive device to attract traffic over which the forwarders have control of routing." As the Board noted in its first decision, many payments of brokerage are made to forwarders who have done little or no work. Where shippers have performed all their own forwarding services brokerage is nevertheless paid by carriers. Despite the very tenuous basis for a claim by forwarders that they are entitled to

---

**7.** The witness Schorer, Pacific Coast Manager of the Holland-America Line, San Francisco, testified with respect to Rule 21 provision for payment of three-quarters of one percent for brokerage on grain products, that he thought it advisable for steamship companies to have the right to have such a provision. When asked if he could justify that percent he replied: "I would say that in general grain products move in such large volumes, that is, volume bill of lading shipments, that that in its reduced percentage would produce sufficient compensation for any broker or forwarder, or broker-forwarder who might be mediating in that shipment to be adequately rewarded."

He similarly testified concerning the other limitations of Rule 21.

brokerage, see American Union Transport v. United States, 103 U.S.App.D.C. 229, 257 F.2d 607, we raise no question as to the right of the Commission to make a determination that a complete prohibition of payment of brokerage to freight forwarders would be detrimental to the commerce of the United States; but when it comes to placing a precise and definite limitation upon the power of a conference to fix a maximum for its members, we think that such determination must be based upon facts and findings.

An attempt is made to argue that the petitioner here failed to exhaust its administrative remedy because it failed to petition the Commission for rehearing. Section 10 of the Administrative Procedure Act, (Title 5 U.S.C. § 1009), expressly provides that "Agency action otherwise final shall be final for the purposes of this subsection whether or not there has been presented or determined any application * * * for any form of reconsideration." We think it would be absurd to say that an application for reconsideration does not affect the finality of orders made, and at the same time say that an application for reconsideration is a prerequisite to a petition for review.

Our decision did not require that the Commission dismiss the proceeding under its docket No. 831. It merely vacated and set aside the order under review. We see no reason why the Commission is not empowered to hold further hearings in its docket No. 831 providing such hearings if they resulted in an order of the kind here in issue provide for evidence and findings as required by law. Accordingly our decision is amended by adding to the next to the last paragraph of our opinion, following the word "concerned": "The cause is remanded to the Commission for the taking of evidence and making of findings as required and directed by this decision. Nothing herein is intended to limit the right of the Commission, if it chooses to do so, to simplify its proceedings by initiating a new proceeding directed simply to an adjudication of the validity of Rule 21."

The petitions for rehearing are denied.