350 F.2d 197
 PACIFIC COAST EUROPEAN CONFERENCE and Members Thereof, Petitioners,
v.
UNITED STATES of America and Federal Maritime Commission,
Respondents.
LATIN AMERICA/PACIFIC COAST STEAMSHIP CONFERENCE, Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents.
PACIFIC COAST RIVER PLATE BRAZIL CONFERENCE and Its Member
Lines, Petitioners,
v.
UNITED STATES of America and Federal Maritime Commission, Respondents.
 Nos. 19237-19239.
 United States Court of Appeals Ninth Circuit.
 Feb. 3, 1965, Rehearing Denied April 30, 1965.
 
 Leonard G. James, Robert L. Harmon, F. Conger Fawcett, Graham, James & Rolph, San Francisco, Cal., for petitioners.
 James L. Pimper, Gen. Counsel, Robert B. Hood, Jr., Federal Maritime Commission, Wm. H. Orrick, Jr., Asst. Atty. Gen., Irwin A. Seibel, Atty., Dept. of Justice, Washington, D.C., for respondents.
 Jerome H. Heckman, Robt. R. Tiernan, Keller & Heckman, Washington, D.C., for Dow Chem. Co. and Dow Chem. Intl., SA, intervenors.
 Before HAMLEY, MERRILL and BROWNING, Circuit Judges.
 MERRILL, Circuit Judge.
 
 
 1
 The orders here under review[1] are two[2] of twenty-two substantially similar orders issued by the Federal Maritime Commission pursuant to its report entitled The Dual Rate Cases.
 
 
 2
 The orders are here attacked as in excess of the Commission's authority as bestowed by 14b of the Shipping Act of 1916, as amended 46 U.S.C. 813a (Supp. V, 1964)[3] (later discussed), and contrary to the intent of that section; and, through lack of notice and hearing, as in violation of the Administrative Procedure Act, 60 Stat. 237 (1946), 5 U.S.C. 1001-1011 (1958).
 
 
 3
 Petitioners are three of some sixty steamship conferences affected by The Dual Rate Cases and orders entered pursuant to that report. These conferences are rate-fixing associations of carriers, all of whom are engaged in the waterborne commerce of the United States and whose association is permitted by 15 of the Shipping Act of 1916, as amended 46 U.S.C. 814 (Supp. V, 1964), subject to approval of their agreements of association by the Federal Maritime Commission.
 
 
 4
 These proceedings involve those provisions of the several agreements of association which permit the fixing of 'dual rates': the granting by a conference of preferential rates to shippers who have agreed with the conference to patronize it exclusively.
 
 
 5
 Prior to the enactment of the legislation with which we are here concerned the lawfulness of dual rate contracts had long been questioned as contrary to established antitrust policy. In 1958 the Supreme Court in Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958), had held such a contract to be in violation of 14 Third of the Shipping Act of 1916, 39 Stat. 733 (1916), and had thus cast doubt on the validity of such arrangements. Congress sought to clarify and remedy the situation. After three years of study Public Law 87-346, 75 Stat. 762 (1961), was enacted October 3, 1961. Its declared purpose was '* * * to authorize ocean common carriers and conferences thereof serving the foreign commerce of the United States to enter into effective and fair dual rate contracts with shippers and consignees * * *.' By 3, interim validity of existing dual rate agreements was provided.
 
 
 6
 The meat of the Act was in what has become 14b of the Shipping Act of 1916, as amended, 75 Stat. 762 (1961), 46 U.S.C. 813a (Supp. V, 1964), which provides that the Federal Maritime Commission shall permit dual rate agreements,'* * * unless the Commission finds that the contract * * * will be detrimental to the commerce of the United States or contrary to the public interest, or unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors.'
 
 
 7
 The authority of the Commission to permit such contracts was limited by requiring that the contracts in eight specified respects meet the congressional judgment as to what they should include. Listed as specification Nine was the requirement that a contract shall contain '* * * such other provisions not inconsistent consistent herewith as the Commission shall require or permit.' Thus was imposed upon the Commission the task of reviewing and revising all agreements under which the conferences were operating with respect to dual rates.
 
 
 8
 The provisions for interim validity of existing dual rates contracts set forth a schedule for bringing those contracts into line with 14b's requirements. The conferences, within six months, were to file with the Commission their proposals as to how their existing contracts should be amended to meet the new requirements. Thereafter the existing contracts as so amended should be valid for a further period of one year, during which period 'the Commission shall approve, disapprove, cancel or modify all such agreements and amendments in accordance with the provisions of this Act.' By subsequent enactment the time allowed the Commission (and the period of interim validity) was extended to April 3, 1964, 77 Stat. 5 (1963).
 
 
 9
 These petitioners duly submitted their proposed amendments to the Commission before expiration of the six-month period specified.
 
 
 10
 On March 21, 1962, the Commission gave notice by publication in the Federal Register, 27 Fed.Reg. 2647 (1962), that pursuant to the provisions of the Shipping Act it was considering the promulgation of certain rules and regulations governing the use of contract rate systems as authorized by 14b.
 
 
 11
 On January 3, 1963, the Commission published in the Federal Register its 'Notice of Proposed Final Rules and Uniform Agreement.' Reciting its earlier notice the Commission stated:
 
 
 12
 'Having given due consideration to the comments of interested persons filed in response to said notice the Federal Maritime Commission hereby gives notice that it is considering the promulgation of final rules in this matter. These proposed final rules are as follows:' 28 Fed.Reg. 74 (1963).
 
 
 13
 There followed a proposed uniform contract for all conferences.
 
 
 14
 A storm of protest arose from the conferences over this proposed resort to a uniform contract. The conferences contended that the Commission's function under 14b was to conduct individual hearings on the amendments as proposed by the individual conferences to determine whether those amendments conformed to the requirements of that section.
 
 
 15
 The Commission acceded to conference demands. On April 9, 1963, it entered its 'Order of Investigation and Hearing' respecting Pacific Coast European Conference (typical of the orders respecting the individual conferences) for hearing before an examiner upon the amended contract as proposed by that conference.[4]
 
 
 16
 Subsequently, on the petition of various shippers and shipper associations, certain so-called 'major issues' were severed from most of the proceedings on the individual contracts and were heard before a panel of five examiners in a proceeding assigned Commission Docket No. 1111. The Commission's order of investigation and hearing in this docket stated that the proceeding was instituted in order to lessen the burden of shippers (who might be signatories to dual rate contracts with a number of conferences, and who might otherwise have to participate in substantially every proceeding before the Commission), and for the purpose of achieving 'optimum uniformity' in contract provisions.
 
 
 17
 On December 3, 1963, petitioners' examiner rendered his initial decision. Subject to certain specified modifications, and subject to the rulings in Docket 1111, he concluded that the proposed contract met the requirements of 14b and was not detrimental to the commerce of the United States, contrary to the public interest or unjustly discriminatory or unfair and should be permitted in use in foreign commerce by the conference.
 
 
 18
 On March 27, 1964, the Commission handed down its report entitled The Dual Rate Cases, together with orders in petitioners' proceedings to the effect 'that the agreement submitted to the Commission by the respondents in the above proceedings are hereby approved in the form attached to this order' and providing that the attached form of order should become effective April 4, 1964, 'to the exclusion of any other terms and provisions.' The report and order were served on petitioners on March 30, 1964.
 
 
 19
 The form of contract attached to the order was initiated by the Commission pursuant to the findings and conclusions of The Dual Rate Cases and was not the contract considered by the examiner in petitioners' proceedings. It contained provisions not specifically required by 14b and not discussed in the hearings had upon petitioners' proposed contracts.
 
 
 20
 Petitioners assert that they were thus required, on four days' notice, to commit themselves by agreement to grant concessions to contract shippers above and beyond those called for by the Shipping Act, as to which there has been no hearing in their proceedings, and which in fact were, as to them, unnecessary and prejudicial to the point of unfairness.
 
 
 21
 Petitioners did not seek rehearing before the Commission pursuant to its Rule 16, 18 Fed.Reg. 3726 (1953), 46 C.F.R. 201.261,[5] upon these protested contractual provisions. Instead they promptly brought this proceeding for judicial review, not primarily attacking the substance of the contracts approved by the Commission but rather the procedures by which they were formulated.
 
 
 22
 1. Petitioners contend that their rights under their outstanding contracts constituted property rights protected by the Fifth Amendment; that Congress through enactment of 14b and the Commission by imposing a mandatory agreement upon the conference without their consent have deprived them of their right freely to contract about their business affairs. Specifically, petitioners contend that their contracts constitute property which the Commission is 'taking' without due process.
 
 
 23
 It is obvious, however, that although in contract form, what the Congress and the Commission have imposed upon the conferences is simply regulation. The conferences have no right, constitutional or otherwise, to exemption from such regulation. Addyston Pipe & Steel Co. v. United States,175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). They have no right, constitutional or otherwise, to persist in a course which Congress has now found to be discriminatory to shippers and violative of the antitrust policies.[6]
 
 
 24
 2. Petitioners contend that the Commission has not proceeded in accordance with 14b. They point to the statutory provision that the Commission shall permit the use by a conference of any contract providing dual rates unless the Commission finds the contract to be detrimental to commerce or contrary to public interest or unjustly discriminatory or unfair. They assert that the Commission has not so found as to their proposed contract, and that the hearing examiner expressly found to the contrary. They contend that the congressional intent, disregarded by the Commission, was to authorize conferences to continue under their existing contracts without interruption, provided only that they be amended to the extent required.
 
 
 25
 But petitioners overlook 14b's all-important proviso-- 'provided that the contract * * * expressly * * * (9) contains such other provisions not inconsistent herewith as the Commission shall require or permit.'
 
 
 26
 There was thus plain authority in and direction to the Commission to give consideration to and to require agreement on other matters than those occurring to Congress.[7] Such matters would normally be initiated by the Commission and its reference to an examiner of petitioners' proposals can hardly be construed as a delegation or a surrender of that function.
 
 
 27
 As to deference owed to existing contracts, the Commission had made it plain from the outset that it regarded uniformity of contract, a counterbalancing consideration, as desirable in the public interest. Legislative history demonstrates that such was the view of Congress as well.[8] While strict uniformity did not result due to difference of circumstances affecting the different conferences, it was certainly within the authority of the Commission, and, as we view it, wholly consistent with the spirit of the Shipping Act of October 3, 1961, to seek uniformity to the extent possible.
 
 
 28
 As to the Commission's method of consolidating hearings upon issues and of filing a consolidated report, we note that there were approximately sixty different conference contracts submitted for approval. In each, the issue was whether the contract contained the provisions required by the new Shipping Act. Under these circumstances it would have imposed an unusually heavy burden upon the Commission to require it to treat each contract individually despite the existence of common questions.
 
 
 29
 We conclude that the Commission's procedures were not contrary to 14b.
 
 
 30
 3. Petitioners attack the procedure followed by the Commission as violative of the Administrative Procedure Act in certain respects. They make the following contentions:
 
 
 31
 (a) Neither the order nor the report The Dual Rate Cases contain findings, conclusions or reasons or basis for the Commission's decision, contrary to the requirements of 8(b) of the Administrative Procedure Act, 5 U.S.C. 1007(b) (1958).
 
 
 32
 (b) Under 7(d) of the Administrative Procedure Act, 5 U.S.C. 1006(d) (1958), the transcript of testimony and exhibits in petitioners' proceedings should have constituted the exclusive record for decision of the Commission. By including in its approved contract clauses other than those under consideration in petitioners' proceedings, the Commission has gone beyond this record.
 
 
 33
 These sections of the Administrative Procedure Act relate primarily to adjudicatory proceedings rather than rule making proceedings. It is clear that in promulgating The Dual Rate Cases the Commission was proceeding in the area of rule making.
 
 
 34
 'Rule' and 'rule making' are defined as follows in 2(c) of the Administrative Procedure Act, 5 U.S.C. 1001(c) (1958):
 
 
 35
 'Rule' means the whole or any part of any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of any agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefore or of valuations, costs, or accounting, or practices bearing upon any of the foregoing. 'Rule making' means agency process for the formulation, amendment, or repeal of a rule.'
 
 
 36
 Petitioners contend that 14b did not permit the Commission to proceed by general rule; that it was required by the Shipping Act to proceed on a contract-by-contract basis. For the reasons already discussed we cannot agree.[9]
 
 
 37
 In our judgment the terms and conditions under which dual rates might be charged were the subject of rule making. In this area the Commission was acting in implementation of 14b; its action was legislative rather than judicial in character. It was a prospective determination of the standards under which the conferences were to be permitted to act in the future rather than an adjudication as to whether those standards in a particular case had been met.[10] The rule making requirements with respect to hearings are set forth in 4(b) of the Administrative Procedure Act, 5 U.S.C. 1003(b) (1958), which provides:
 
 
 38
 'After notice required by this section, the agency shall afford interested persons an opportunity to participate in the ruling making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose.'
 
 
 39
 It is apparent that in rule making hearings the purpose is to permit the agency to educate itself and not to allow interested parties to choose the issues or narrow the scope of the proceedings. The purpose of the notice is to allow interested parties to make useful comment and not to allow them to assert their 'rights' to insist that the rule take a particular form. The agency, in rule making, can look beyond the particular hearing record since it otherwise would be unable to draw upon its expertise.
 
 
 40
 That 7 and 8 of the Administrative Procedure Act are not to apply to the rule making hearings required by 14b of the Shipping Act is also clear from 4(b) of the Administrative Procedure Act:
 
 
 41
 'Where rules are required by statute to be made on the record after opportunity for any agency hearing, the requirements of section 1006 and 1007 of this title shall apply in place of the provisions of this subsection.'
 
 
 42
 While 14b does require 'notice and hearing,' still, it does not require that the rules for which it provides be made 'on the record' after opportunity for agency hearing. The provisions of 7 and 8 of the Administrative Procedure Act, therefore, do not apply to the rule making provisions of 14b of the Shipping Act.
 
 
 43
 Petitioners contend that the Commission, by ordering hearings on the individual contracts proposed by the conferences, abandoned its rule making approach and resorted instead to a series of adjudicatory proceedings upon the individual contracts under consideration; that the requirements of 7 and 8 of the Administrative Procedure Act should apply to those proceedings. They assert that when, on March 27, 1964, The Dual Rate Cases was handed down, the Commission thus, without notice, reverted to rule making, disregarding and abandoning in mid-stream their adjudicatory proceedings and the rights of the conferences which were there in issue.
 
 
 44
 In this we agree in part with petitioners.
 
 
 45
 As we view the situation, the Commission was faced with the choice of going ahead as originally planned by general rule and uniform contract or of proceeding on a contract-by-contract basis in a series of adjudicatory proceedings to determine the sufficiency of the individual contracts under 14b, with the Act, unimplemented by rule, forming the applicable standard.
 
 
 46
 Although the proposed uniform contract, as published in January, 1963, was never formally withdrawn, still, by acceding to conference demands, and by entering its orders of April 9, 1963, for hearing before an examiner of petitioners proposed contracts, the Commission indicated that it had chosen to proceed not by general rule but by individual adjudicatory proceedings on the individual contracts. Petitioners could reasonably assume from this action that they were engaged in a hearing under 7 and 8 of the Administrative Procedure Act, with the issues limited to such matters as were there presented.
 
 
 47
 We do not agree with petitioners that the Commission thereafter was without power to revert to general rule and that its only alternative was to proceed under 7 and 8.
 
 
 48
 In our judgment, however, under the requirements of the Administrative Procedure Act, it could not revert to general rule without first giving a 4(b) notice of its intention and opportunity to petitioners to participate in the making of rules in the manner set forth in 4(b). This it has not done. The remedy, however, is not through judicial action to restore to the conferences their own form of contract, but rather to restore to the conferences their opportunity to participate.
 
 
 49
 We conclude that the order of the Commission must be set aside and that in any new order opportunity must be afforded petitioners to participate in rule making in such manner as the Commission may direct pursuant to 4(b); such participation, however, to be limited to such clauses of the proposed contract as were not, in subject matter, dealt with in the hearings in petitioners' adjudicatory dockets or in Docket 1111.
 
 
 50
 This is not intended to suggest that notice was deficient only in its scope and that it must have encompassed the whole of the rule which ultimately emerged. We recognize that such is not the law. The deficiency here was in failure to give any notice whatsoever. It is the prejudice resulting from this failure which is limited, and which impels us to limit the scope of the participation to which petitioners are entitled upon remand. Petitioners have already, through the hearings which have been had, enjoyed to the fullest participation in the making of the resulting rule in the areas covered by those hearings.
 
 
 51
 We gather that this area in which petitioners have already participated covers the greater portion of the contract as approved by the Commission. As to that portion, the Commission is, of course, free forthwith to promulgate rules and establish the substance of approved contracts as to petitioners.
 
 
 52
 As to the contract of one of the petitioners, Latin America/Pacific Coast Steamship Conference (Docket No. 1092), a hearing was ordered by the Commission but the conference was not named as party to Docket 1111. What we have said, however, applies to this petitioner as well as to the rest. Since the Commission was proceeding in the area where rule making was not required to be made 'on the record,' the notice and hearing requirements of 4(b) of the Administrative Procedure Act were met if the conference had notice, and an opportunity to present its views to the Commission in hearing of Docket 1111. This it clearly had.[11] If it had anything to submit it could have joined in any appropriate proceeding.
 
 
 53
 Accordingly the orders under review are hereby set aside.
 
 
 
 [1]
 Pursuant to the Review Act of 1950, as amended in 1958, 5 U.S.C. 1031-1042 (1958)
 
 
 [2]
 One of the orders relates to two petitioners: Latin America/Pacific Coast Conference and Pacific Coast River Plate Brazil Conference (FMC Docket Nos. 1092 and 1057, respectively)
 
 
 [3]
 'Notwithstanding any other provisions of this Act, on application the Federal Maritime Commission (hereinafter 'Commission'), shall, after notice, and hearing, by order, permit the use by any common carrier or conference of such carriers in foreign commerce of any contract, amendment, or modification thereof, which is available to all shippers and consignees on equal terms and conditions, which provides lower rates to a shipper or consignee who agrees to give all or any fixed portion of his patronage to such carrier or conference of carriers unless the Commission finds that the contract, amendment, or modification thereof will be detrimental to the commerce of the United States or contrary to the public interest, or unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, and provided the contract, amendment, or modification thereof, expressly (1) permits prompt release of the contract shipper from the contract with respect to any shipment or shipments for which the contracting carrier or conference of carriers cannot provide as much space as the contract shipper shall require on reasonable notice; (2) provides that whenever a tariff rate for the carriage of goods under the contract becomes effective, insofar as it is under the control of the carrier or conference of carriers, it shall not be increased before a reasonable period, but in no case less than ninety days; (3) covers only those goods of the contract shipper as to the shipment of which he has the legal right at the time of shipment to select the carrier: Provided, however, That it shall be deemed a breach of the contract if, before the time of shipment and with the intent to avoid his obligation under the contract, the contract shipper divests himself, or with the same intent permits himself to be divested, of the legal right to select the carrier and the shipment is carried by a carrier which is not a party to the contract; (4) does not require the contract shipper to divert shipment of goods from natural routings not served by the carrier or conference of carriers where direct carriage is available; (5) limits damages recoverable for breach by either party to actual damages to be determined after breach in accordance with the principles of contract law: Provided, however, That the contract may specify that in the case of a breach by a contract shipper the damages may be an amount not exceeding the freight charges computed at the contract rate on the particular shipment, less the cost of handling; (6) permits the contract shipper to terminate at any time without penalty upon ninety days' notice; (7) provides for a spread between ordinary rates and rates charged contract shippers which the Commission finds to be reasonable in all the circumstances but which spread shall in no event be more than 15 per centum of the ordinary rates; (8) excludes cargo of the contract shippers which is loaded and carried in bulk without mark or count except liquid bulk cargoes, other than chemicals, in less than full shipload lots: Provided, however, That upon finding that economic factors so warrant, the Commission may exclude from the contract any commodity subject to the foregoing exception; and (9) contains such other provisions not inconsistent herewith as the Commission shall require or permit. The Commission shall withdraw permission which it has granted under the authority contained in this section for the use of any contract if it finds, after notice and hearing, that the use of such contract is detrimental to the commerce of the United States or contrary to the public interest, or is unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreigncompetitors. The carrier or conference of carriers may on ninety days' notice terminate without penalty the contract rate system herein authorized, in whole or with respect to any commodity: Provided, however, That after such termination the carrier or conference of carriers may not reinstitute such contract rate system or part thereof so terminated without prior permission by the Commission in accordance with the provisions of this section. Any contract, amendment, or modification of any contract not permitted by the Commission shall be unlawful, and contracts, amendments, and modifications shall be lawful only when and as long as permitted by the Commission; before permission is granted or after permission is withdrawn it shall be unlawful to carry out in whole or in part, directly or indirectly, any such contract, amendment, or modification. As used in this section, the term 'contract shipper' means a person other than a carrier or conference of carriers who is a party to a contract the use of which may be permitted under this section.'
 
 
 [4]
 The order provides in part:
 'The Commission has before it the approval, disapproval, modification or cancellation of the above amended exclusive patronage (dual rate) contract.
 'THEREFORE, IT IS ORDERED, That pursuant to sections 14b and 22 of the Shipping Act, 1916, an investigation and hearing is hereby instituted to determine whether the form of said exclusive patronage (dual rate) contract meets the requirements of section 14b, will be detrimental to the commerce of the United States or contrary to the public interest, or unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, and whether the use of said form of exclusive patronage (dual rate) contract should be permitted or said contract should be ordered modified in any respect whatsoever pursuant to section 14b.'
 
 
 [5]
 This Rule provides, in part, as follows: 'Upon petition or its own motion, the Board (now Commission) may at any time after reasonable notice, reopen any proceeding under these rules for rehearing, reargument, or reconsideration and, after opportunity for hearing, may alter, modify, or set aside in whole or in part its report of findings or order therein if it finds such action is required by changed conditions in fact or law or by the public interest.'
 
 
 [6]
 It should be noted that petitioners are required to use the contracts here at issue only if they wish some of their practices to be exempted from the provisions of the antitrust laws. If they do not wish to be so exempted, they need not, of course, accept the contract promulgated by the Commission
 
 
 [7]
 For example, the Senate Commerce Committee Report on the bill stated: 'This broad rulemaking mandate (of 9) should move the Commission, for example, to deal with three matters which the National Industrial Traffic League has urged upon us and upon the House Committee. While we would be strongly opposed to trying to freeze into legislation the solution to any of these three problems, they present matters which it seems to us the Commission is equipped to an should deal with under its rulemaking function.' Index to Legislative History of the Steamship Conference/Dual Rate Law, S.Doc.No. 100, 87th Cong., 1st Sess. 213 (1962)
 
 
 [8]
 As is discussed in the Commission's report, the Committee on the Merchant Marine and Fisheries of the House of Representatives, in its report on the bill which ultimately became Public Law 87-346, made it clear that the statute should result in more or less uniform dual rate contracts. The Committee said:
 'It is the expectation of the committee that a standard form of contract to be utilized by all conferences will be approved by the Board (now Commission) with such riders as may be required to suit the needs of a particular trade. This will greatly simplify the problem of shippers, who, of necessity must be members of a number of conferences, with respect to interpretation and application of differing provisions.' Senate Committee on Commerce, Index to the Legislative History of the Steamship Conference Rate Law, S.Doc.No. 100, 87th Cong., 1st Sess. 120 (1962).
 This objective was further emphasized by the Antitrust Subcommittee of the Committee on the Judiciary which played a major role (see Index to the Legislative History of the Steamship Conference/Dual Rate Law, supra, 117) in the formulation of Public Law 87-346 when it subsequently said:
 'The Federal Maritime Commission should establish minimal standards for dual-rate contracts beyond those set forth in Public Law 87-346 and should devise and publish a basic form contract to be used by all conferences.' H.Rept. No. 1419, 87th Cong., 2d Sess., page 390 (1962).
 Petitioners argue that the House Reports should be paid little heed because the House-passed bill was amended in certain regards in the Senate. These amendments, however, had no bearing upon the need for uniform contracts. If anything, they strengthened the statutory position of the Commission from what it had been under the House-drafted bill. Thus the report of the House managers of the bill, after the Senate-House conference, stated that:
 'The House authorized the Commission to make rules and regulations necessary under specified sections of the act: the Senate amended by broadening the authority to include the entire act. The House receded from its position.' Index to the Legislative History of the Steamship Conference/Dual Rate Law, supra, 445.
 
 
 [9]
 Both the Senate and House committee reports on the bill extending the time allowed the Commission (77 Stat. 5 (1963)) treated the action here under review as rule making: 'The volume and diversity of comments from carriers and shippers in the necessary rulemaking procedures were enormous * * *.' S.Rept. No. 79, 88th Cong., 1st Sess. 2 (1963); U.S.Code Cong. and Admin. News 1963, p. 620; 'In view of the necessity of examining these contracts * * * and the necessity of instituting a rule making procedure to achieve uniformity in its results * * *.' H.R.Rept. 164, 88th Cong., 1st Sess. 2 (1963)
 
 
 [10]
 Anglo-Canadian Shipping Co. v. FMC, 310 F.2d 606 (9 Cir. 1962), cited by petitioners is not in point as there all parties agreed that the proceeding was adjudicatory, 310 F.2d 606, 615, n. 2
 
 
 [11]
 For example, the conference in Docket 1092 was represented by the same counsel who represented the conference in Docket 1057, which was made a party to Docket 1111