Paul SIEGEL, Petitioner,

v.

**ATOMIC ENERGY COMMISSION and
United States of America,
Respondents,**

**Florida Power and Light Company,
Intervenor.**

Paul SIEGEL, Petitioner,

v.

**ATOMIC ENERGY COMMISSION and
United States of America,
Respondents.**

Nos. 21334, 21342.

United States Court of Appeals
District of Columbia Circuit.

Argued May 22, 1968.

Decided Aug. 6, 1968.

Petition for Rehearing Denied
Sept. 30, 1968.

Mr. Paul Siegel, pro se.

Mr. Marcus A. Rowden, Asst. General Counsel, Atomic Energy Commission, with whom Donald F. Turner, Asst. Atty. Gen., and Mr. Howard K. Shapar, Asst. General Counsel, Atomic Energy Commission, were on the brief, for respondents. Mr. Howard E. Shapiro, Atty., Department of Justice, also entered an appearance for appellee United States of America, Mr. Thomas F. Engelhardt, Atty., Atomic Energy Commission, also entered an appearance for respondent, Atomic Energy Commission.

Mr. Phillip Goldman, Miami, Fla., with whom Mr. Roy B. Snapp, Washing-

ton, D. C., was on the brief for intervenor in No. 21,334.

Before BAZELON, Chief Judge, and BASTIAN, Senior Circuit Judge, and McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

These two statutory review proceedings, heard together, turn largely upon a common question: Must the Atomic Energy Commission, in licensing the construction of nuclear reactors for peaceful civilian use, take into account, and require a showing of effective protection against, the possibilities of attack or sabotage by foreign enemies? No. 21,-334 challenges an order of the Commission authorizing a public utility company to construct two nuclear reactors for the generation of electricity. No. 21,342 attacks the validity of a regulation issued by the Commission in rule-making proceedings. The various substantive and procedural defects attributed to each essentially derive from the negative answer given by the Commission to the central question. If that answer was within the Commission's power to give, the orders may stand. We think it was.

I

The intervenor here in No. 21,334—Florida Power & Light Company—is the owner of 1900 acres of land on the west shore of Biscayne Bay, known as the Turkey Point site. Located about 25 miles south of Miami, the area is swampy and unpopulated, and is to be used by intervenor as the site of generating facilities, both nuclear and conventional. Early in 1966 intervenor applied to the Commission for authority to construct two pressurized water reactors in which steam will be created by atomic processes to drive turbines generating electricity.[1]

---

1. The applicable statute is the Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2011. et seq. The section immediately relevant to the application is § 2134(b), which provides as follows: "The Commission is authorized to issue licenses to persons applying therefor for utilization and production facilities involved in the conduct of research and development activities leading to the demonstration of the practical value of such facilities for industrial or commercial purposes. In issuing licenses under this subsection, the Commission shall impose the minimum amount of such regulations and terms of license

As the Act requires, the application was initially examined by the Commission's staff, and also by the Advisory Committee on Reactor Safeguards, the latter being a group of independent experts from which the Act requires the Commission to receive a report on each power reactor application. Thereafter the Commission set the matter for hearing by an atomic safety and licensing board consisting of a federal hearing examiner and two technical experts. The notice of the hearing specified a number of issues to be explored, including the one of whether the construction of the proposed facility "will be inimical to the common defense and security or to the health and safety of the public."

Petitioner sought leave to intervene, alleging that he was a resident of Miami and that his interest as such "might be affected by intentional attempts to harm the reactors, such as a bombing attack against them from Cuba." The special nature of petitioner's concern is more precisely articulated in the following assertions made to us in his brief:

"In the case of the FP&L reactors there is a particular need to consider the potential effect on the reactors of the weapons in the arsenal of Cuba, because of the proximity of that country to the reactor site, the Communist government which controls it, and the instability of its leader."

\* \* \* \* \* \*

"The problem is not the probability of sabotage or enemy attack in the context of the world situation existing in the year 1967, but rather that probability for the years 1970 through 2011, when the Florida Power & Light reactors are expected to be operating."

At a prehearing conference on February 10, 1967, there was extensive argument about the propriety of permitting petitioner to intervene, centering around the question of the relevance of enemy attack or sabotage. The hearing board at length permitted intervention, but signified its purpose to certify promptly to the Commission the question of whether the board should concern itself with the contingency of hostile enemy action. This was done on February 14, and six days later a response was received from the Commission to the effect that the Commission's established policy and practice of not requiring special design features to protect against enemy attack had been embodied in a notice of proposed rule-making approved for issuance on February 9.[2] A copy of that notice was

---

as will permit the Commission to fulfill its obligations under this chapter to promote the common defense and security and to protect the health and safety of the public and will be compatible with the regulations and terms of license which would apply in the event that a commercial license were later to be issued pursuant to section 2133 for that type of facility. In issuing such licenses, priority shall be given to those activities which will, in the opinion of the Commission, lead to major advances in the application of atomic energy for industrial or commercial purposes."

Subparagraph (d) of the same section directs that no license is to issue "if, in the opinion of the Commission, the issuance of a license \* \* \* would be inimical to the common defense and security or to the health and safety of the public." The definitions section of the Act, § 2014, deals with the first

of these standards but not the second. It characterizes "common defense and security" used throughout the Act as meaning "the common defense and security of the United States."

2. Section 2201 of the Act provides as follows:
"In the performance of its functions the Commission is authorized to—
\* \* \* \* \*
"(b) establish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and byproduct material as the Commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property;
\* \* \* \* \*
"(i) prescribe such regulations or orders as it may deem necessary (1) to protect Restricted Data received

supplied, and the board was instructed not to address itself to the subject matter identified in its certified question.

At the subsequent hearing on the merits of the application, petitioner, although apparently offering no witnesses or evidence of his own, sought by cross-examination to inquire into the matter of protection against enemy attack. The board sustained objections to this effort. The hearing eventuated in an Initial Decision by the hearing board that the construction permits be issued. The board expressly disclaimed any consideration by it of the potentialities of enemy action in concluding that the proposed construction was compatible with "the common defense and security" and "the health and safety of the public."

Petitioner's exceptions to the Initial Decision raised essentially two issues.[3] One was the substantive issue that the board's conclusions in the respects just mentioned were insupportable because of the lack of evidence on enemy attack; and the other was the procedural claim that the board's foreclosure of inquiry into this area deprived petitioner of the hearing he was entitled to have under the statutes and the Constitution. Except in certain particulars not in issue here, the Commission accepted the hearing board's conclusions.

In its Memorandum and Order of August 4, 1967, the Commission dealt at length with petitioner's exceptions. It noted the degree to which Congress had explicitly vested in the Commission the responsibility for interpreting and implementing the general standards contained in the Act, including those articulated as "the common defense and security" and "the health and safety of the public." It asserted that nothing in the Act or its predecessor, nor in the legislative history of either, suggested a Congressional purpose to comprehend within these standards the possibility of enemy attack. It referred to the fact that the detailed regulations it had issued with respect to these standards had never contemplated inquiry into enemy attack, and that the Commission's fixed practice had been to regard such inquiry as unnecessary—a practice now embodied in a specific proposed regulation.

The circumstances at the time of the passage of the Act, so that the Commission, indicated that the Congressional concern with "the common defense and security" related to such matters as "the safeguarding of special nuclear material; the absence of foreign control over the applicant; the protection of Restricted Data; and the availability of special nuclear material for defense needs." The public health and safety standard, in like fashion, was said to be addressed "to the overall qualifications of the applicant and the design of the facility to

by any person in connection with any activity authorized pursuant to this chapter, (2) to guard against the loss or diversion of any special nuclear material acquired by any person pursuant to section 2073 * * * or produced by any person in connection with any activity authorized pursuant to this chapter, and to prevent any use or disposition thereof which the Commission may determine to be inimical to the *common defense and security,* and (3) to govern any activity authorized pursuant to this chapter, including standards and restrictions governing the design, location, and operation of facilities used in the conduct of such activity, in order to protect health and to minimize danger to life or property; * * * "

Section 2232(a) requires each applicant for an operating license to supply such information "as the Commission may, by rule or regulation, deem necessary in order to enable it to find that the utilization or production of special nuclear material will be in accord with the common defense and security and will provide adequate protection to the health and safety of the public. * * * "

3. It is not clear that, either before the Commission or here, petitioner has challenged the construction licenses on any ground other than those discussed in this opinion and which relate to the problem of enemy attack. To the extent petitioner may be taken as objecting to the inadequacy of the evidentiary support in other respects, we find such objection unavailing.

protect plant employees and the public against accidents and their consequences." So viewed, the Commission concluded that neither of the standards contemplated that an applicant be required to show "special design features or other measures for the specific purpose of protection against the effects of enemy attacks and destructive acts."[4]

The rationality of this approach the Commission thought to find in such considerations as (1) the impracticability, particularly in the case of civilian industry, of anticipating accurately the nature of enemy attack and of designing defenses against it, (2) the settled tradition of looking to the military to deal with this problem and the consequent sharing of its burdens by all citizens, and (3) the unavailability, through security classification and otherwise, of relevant information and the undesirability of ventilating what is available in public proceedings.

As to petitioner's claim of a denial of procedural due process, the Commission said that, if it was right in concluding that the matter should not be gone into at all, foreclosing petitioner from cross-examination about it could not possibly violate any statutory or constitutional right to be heard. In a stipulation filed in this court, petitioner "concedes that for the purpose of this review proceeding he does not contend that he was denied a full and complete hearing in any respect other than with respect to the subject of possible attacks and destructive acts directed against the reactor by an enemy of the United States."

The notice of proposed rule-making was published on February 11, 1967. It stated that written comments would be received. In response to this invitation, petitioner sent the Commission a letter, dated March 10, 1967, expressing doubts about the desirability of the proposed rule. He expressed the hope that the Commission would consider the matter carefully and he asked that, before making the regulation effective, a public hearing be held under Section 2239 of the Act,[5] and that "this be an 'on the record' hearing" under Sections 7 and 8 of the Administrative Procedure Act. The Commission informed petitioner by letter of April 5, 1967, that it considered the opportunity to make written comments as satisfying Section 2239. It added that it had considered, on the discretionary basis contemplated in its regulations, the question of holding an informal hearing at which petitioner could be heard, but had decided that no useful purpose would be served. For these reasons it denied the request for a public hearing under Sections 7 and 8 of the Administrative Procedure Act, but it closed by saying that "the Director of Regulation will afford you the opportunity to present your views orally and you will be hearing from him directly." The same day such an invitation was extended to petitioner by the Director of Regulation, but petitioner did not avail himself of it.

The proposed rule was adopted by the Commission on September 19, 1967 and became effective on October 26. The notice accompanying it characterized the regulation amendments as codifying the

4. The Commission noted that there had been extensive inquiry into those aspects of the proposed construction concerned with assuring the safety of plant employees and the public, and that the plans approved were replete with features of this kind. It remarked that, although these safeguards were not addressed to the contingency of enemy attack, many would serve a useful purpose in that eventuality, such as "the massive containment and the procedures and systems for rapid shutdown of the facility."

5. Section 2239(a) of the Act states that "[I]n any proceeding under this chapter, for the granting * * * of any license or construction permit * * * and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees * * * the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding * * *"

Commission's established practice with respect to the dangers of enemy action, and justified the practice in these terms:

"The protection of the United States against hostile enemy acts is a responsibility of the nation's defense establishment and of the various agencies having internal security functions. The power reactors which the Commission licenses are, of course, equipped with numerous features intended to assure the safety of plant employees and the public. The massive containment and other procedures and systems for rapid shutdown of the facility included in these features could serve a useful purpose in protection against the effects of enemy attacks and destructive acts, although that is not their specific purpose. One factor underlying the Commission's practice in this connection has been a recognition that reactor design features to protect against the full range of the modern arsenal of weapons are simply not practicable and that the defense and internal security capabilities of this country constitute, of necessity, the basic 'safeguards' as respects possible hostile acts by an enemy of the United States.

"The circumstances which compel this recognition are not, of course, unique as regards a nuclear facility; they apply also to other structures which play vital roles within our complex industrial economy. The risk of enemy attack or sabotage against such structures, like the risk of all other hostile attacks which might be directed against this country, is a risk that is shared by the nation as a whole."

In his petition to review the amended regulation, petitioner raises essentially the same challenge to the Commission's substantive authority to disregard enemy attack as he does in his attack upon the construction permits in No. 21,334. His procedural objections, however, are concerned with the nature of the hearing he is entitled to have in rule-making; and his contention is that a mere opportunity to submit written comments does not satisfy the requirements of Section 2239 of the Act.

## II

In the Presidential Message recommending the legislation which culminated in the Atomic Energy Act of 1954, it was said that flexibility was a peculiar *desideratum* and that, absent an accumulation of experience with the new civilian industry hopefully to be brought into being, "it would be unwise to try to anticipate by law all of the many problems that are certain to arise." H.R.Doc. No. 328, 83d Cong., 2d Sess. 7 (1954). Congress agreed by enacting a regulatory scheme which is virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives. See Power Reactor Development Co. v. International Union of Electrical, etc., Workers, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961). Congressional consciousness of this uniqueness it attested by the unusual device of instituting the Joint Committee on Atomic Energy to keep Congress in constant touch with what was happening in this unfolding area of industrial applications of atomic energy.

It is against this backdrop that we look to the primary issue formulated in these two review proceedings: Did the Commission step over the bounds of the authority committed to it by excluding the dangers latent in possible enemy action from the inquiry into the merits of a license application? If it did, then it would appear that anyone seeking permission to employ nuclear energy for peaceful industrial uses must shoulder a burden of showing that his proposed facility is adequately protected, now and throughout its entire life, against the various kinds of attacks which might be made upon it by foreign enemies of the United States. What the Commission has essentially decided is that to impose such a burden would be to stifle utterly the peaceful utilization of atomic

energy in the United States. Such a decision hardly seems to us to conflict with the Congressional purposes underlying the Act, nor to exceed the scope of the authority given the Commission by Congress to realize those purposes.

■■ We are unable to find any specific indication, within or without the corners of the statute, that the Commission was commanded to intrude the possibility of enemy action into the concepts of "the common defense and security" and "the public health and safety." [6] The Commission has, we think persuasively, demonstrated that the legislative concerns reflected in these phrases are of another order. In the case of the former, the internal evidence of the Act is that Congress was thinking of such things as not allowing the new industrial needs for nuclear materials to preempt the requirements of the military; of keeping such materials in private hands secure against loss or diversion; and of denying such materials and classified information to persons whose loyalties were not to the United States. In the case of the latter standard of "the public health and safety," the Congressional preoccupation was with *industrial* accidents and the dangers they presented to employees and the neighboring public.

■ In short, Congress certainly can be taken to have expected that an applicant for a license should bear the burden of proving the security of his proposed facility as against his own treachery,

negligence, or incapacity. It did not expect him to demonstrate how his plant would be invulnerable to whatever destructive forces a foreign enemy might be able to direct against it in 1984. We hold that the Commission was well within the limits of the powers delegated to it by Congress when it decided to limit petitioner's cross-examination in the licensing proceeding, and to embody the policy of limitation in its regulations.

### III

Given the authority of the Commission to disregard the factor of enemy attack as a matter of substantive law, the procedural errors claimed by petitioner in No. 21,334 are not troublesome. Petitioner argues, first, that for the Commission in a proceeding involving the standards of "the common defense and security" and "the health and safety of the public," to refuse to explore the dangers from foreign enemies is to fail to accord the hearing provided by Section 2239(a). But this is surely a renewal of the substantive argument in a procedural guise. The hearing granted by the Act presumably must embrace all relevant matters. But, if the Commission is correct in its conclusion that it can and should treat enemy action as irrelevant, it obviously may restrict the hearing to that extent.

■ Petitioner, secondly, contends that the restriction of his efforts to cross-examine violated his rights under Section 7(c) of the Administrative Procedure Act.[7] But that statute also pro-

---

6. Petitioner's argument as to legislative purpose rests almost entirely upon inferences he purports to draw from the so-called Price-Anderson amendments to the Act in 1957. 71 Stat. 576. These provided private insurance and Government indemnities in respect of injuries suffered by the public from a nuclear incident involving a licensed power reactor. Petitioner points to the fact that, although claims arising out of an act of war are specifically excluded by the statute, a report by the Joint Committee contemplates that any single act of sabotage would be covered if it could be shown not to be an act of war. This, in our view, provides very slender sup-

port for petitioner's case and, indeed, leaves his claim about hostile enemy action, which normally comprehends acts of war, in a highly ambivalent state. In any event, we find nothing in the 1957 amendments that suggests an equation between the scope of the indemnity coverage and the Commission's authority to decide what subjects need not be explored under the statutory standards for licensing.

7. 5 U.S.C. § 556(d):
   * * * A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such

vides in terms that "the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence * * *," which the Commission by regulation has done. 10 C.F.R. § 2.743. Here again, therefore, petitioner is thrown back upon the hard fact that the Commission need not hear evidence which it is otherwise entitled to regard as outside the perimeter of the issues. Petitioner's last assertion that, under these circumstances, the restriction of his cross-examination denied him his constitutional protection of due process of law need not detain us at all.

In No. 21,342, petitioner urges that the opportunity afforded him to submit written comments upon the proposed regulation was not an adequate response to his request for a public hearing in accordance with Section 2239 of the Act, such hearing to be, in his terms, "an 'on the record' hearing conducted in accordance with Sections 7 and 8 of the Administrative Procedure Act." The Commission asserts that this request was honored within the accepted and correct reading of the relevant statutes: He was given the hearing to which he was entitled under Section 2239 of the Atomic Energy Act, and he was denied only the hearing to which he was not entitled, that is to say, a formal evidentiary hearing under Sections 7 and 8 of the Administrative Procedure Act.

█ Section 2239(a) of the Atomic Energy Act does not, in its reference to a hearing, distinguish in terms between adjudicatory and rule-making proceedings. See Note 5, *supra*. In neither kind of proceeding does the statute say explicitly that the hearing must be on the record. The Commission has, however, invariably distinguished between the two, and has provided formal hearings in licensing cases, as contrasted with informal hearings in rule-making proceedings confined to written submissions and non-record interviews. It insists that this approach is contemplated by the Administrative Procedure Act, which applies to all agency action taken under the Atomic Energy Act. It points to the relevant section of the Administrative Procedure Act upon rule-making, namely, Section 4(b), 5 U.S.C. § 553(c), which is as follows:

"After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After the consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title [Sections 7 and 8 of the Administrative Procedure Act] apply instead of this subsection."

█ This language seems to say, and has been read by an authoritative source as saying, that the formal procedures of Sections 7 and 8 obtain only where the agency statute, in addition to providing a hearing, prescribes explicitly that it be "on the record." [8] There is no such prescription in the Atomic Energy Act, either in terms or by clear implication; and the Commission has from the beginning differentiated between adjudicatory and rule-making proceedings for purposes of the kinds of hearings necessi-

cross-examination as may be required for a full and true disclosure of the facts * * *

8. The Attorney General's Manual on the Administrative Procedure Act 31 (1947): "The quoted language [the first sentence of Section 4(b)] confers discretion upon the agency, except where statutes require 'formal rule making' sub-

ject to Sections 7 and 8, to designate in each case the procedure for public participation in rule making. Such informal rule making procedures may take a variety of forms: informal hearings with or without a stenographic transcript), conferences, consultations with industry committees, submission of written views, or any combination of these."

tated by each.[9] Petitioner purports to find such an implication in the statutory provisions for judicial review of Commission orders, and the references therein to the records on which such review is to be had. His chief reliance is upon Section 2347(a) of the Judicial Review Act of 1950, but that statute refers only to review on such record as has been made and does not specify what the nature of the record must be in any particular proceeding. Moreover, there is no reason to think that the Judicial Review Act was intended to prescribe the hearing requirements for various agencies at the expense of the respective agency statutes themselves. Petitioner's further argument founded upon the substantial evidence standard of Section 10(e) of the Administrative Procedure Act is, we think, effectively disposed of by reference to what the Ninth Circuit had to say in California Citizens Band Ass'n v. United States, 375 F.2d 43, 54, cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed. 2d 112 (1967):

"When, as here, a statute does not require that a particular kind of rule making be on a record made after a public hearing, the Commission is not confined to evidence presented in some formal manner. It may act not only on the basis of the comments received in response to its notice of rule making, but also upon the basis of information available in its own files, and upon the knowledge and expertise of the agency. Pacific Coast European Conference v. United States, 9 Cir., 350 F.2d 197, 205. See, also, American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S.App.D.C. 310, 359 F. 2d 624, 629."

9. Subpart H of the Commission's Rules of Practice governs the making of regulations relative to rule-making, 10 C.F.R. §§ 2.800 et seq. Section 2.805 of these regulations provides as follows:
"Participation by Interested Persons. (a) The Commission will afford interested persons an opportunity to participate in rule making through the submission of statements, information,

In the last-cited case this court dealt at length with the distinctions between adjudication and rule-making, and with the importance of maintaining them. It reaffirmed, as essential to this end, the necessity of according to the agency great flexibility in the selection of hearing processes appropriate to each. We are not persuaded that the choice made by the Commission in this instance was either inappropriate or unfair in itself, or contrary to statutory direction.

The orders of the Commission under review in both Nos. 21,334 and 21,342 are affirmed.

It is so ordered.

opinions, and arguments in the manner stated in the notice. The Commission may grant additional reasonable opportunity for the submission of comments. (b) The Commission may hold informal hearings at which interested persons may be heard, adopting procedures which, in its judgment, will best serve the purpose of the hearing."