See also D.C. 90 F.Supp. 554.

**ATLANTIC & GULF/WEST COAST OF CENTRAL AMERICA AND MEXICO CONFERENCE (NO. 2743), et al. v. UNITED STATES et al.**

United States District Court
S. D. New York.
Nov. 24, 1950.

Lord, Day & Lord, Parker McCollester, James S. Hemingway, John R. Mahoney, all of New York City, for plaintiffs.

Irving H. Saypol, U. S. Atty., New York City, John F. Baecher and Joe F. Nowlin, Sp. Assts. to Atty. Gen., for U. S.

Paul D. Page, Jr., Solicitor, U. S. Maritime Commission, Washington, D. C., George F. Galland, Washington, D. C., for U. S. Maritime Commission.

Haight, Deming, Gardner, Poor & Havens, Charles S. Haight, Edward H. Mahla and Gordon W. Paulsen, all of New York City, for intervenors Joint Committee of Foreign Freight Forwarders Ass'ns et al.

J. Richard Townsend, San Francisco, Cal., for intervenor, Pacific Coast Customs & Freight Brokers Ass'n.

Before FRANK, Circuit Judge, and McGOHEY and KAUFMAN, District Judges.

McGOHEY, District Judge.

This is an action to annul and set aside an order of the United States Maritime Commission and for a permanent injunction against its enforcement.

Plaintiffs are certain individual steamship lines and the conferences which they have established by means of agreements authorized by § 15 of the Shipping Act, 1916,[1] and previously approved by the Commission. Plaintiffs' trades are between east coast ports of the United States and ports

---

1. 46 U.S.C.A. § 814:

"Every common carrier by water, or other person subject to this chapter, shall file immediately with the commission a true copy, or, if oral, a true and complete memorandum, of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements.

"The commission may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations.

"Agreements existing at the time of the organization of the commission shall be lawful until disapproved by the commission. It shall be unlawful to carry out any agreement or any portion thereof disapproved by the commission.

"All agreements, modifications, or cancellations made after the organization of the commission shall be lawful only when and as long as approved by the

in the Caribbean area, Central and South America.

The defendants are the United States, the Federal Maritime Board[2] and two organizations of foreign freight forwarders.[3]

The Maritime Commission, on April 1, 1947, on its own initiative, ordered the investigation which resulted in the challenged order. The order directing investigation provided:

"ORDERED that the Commission institute public hearings with respect to the payment and non-payment of brokerage by carriers subject to its jurisdiction, and that at such hearings, evidence be received as to whether conference agreements and regulations adopted thereunder, prohibiting the payment of brokerage, are contrary to law or unjustly discriminatory or unfair as between carriers, shippers, importers, exporters, or ports, or detrimental to the commerce of the United States; and it is further

"ORDERED that respondents show cause before the Commission why conference agreements (including regulations, understandings and other arrangements) to which respondents or any of them are parties, which prohibit the payment of brokerage, should not be disapproved."

Public hearings were held in New York and San Francisco. Plaintiffs appeared as did other carriers and their confer-ences as well as freight forwarders and their associations. The Commission's examiners found that agreements not to pay brokerage[4] were detrimental to the commerce of the United States. Plaintiffs' exceptions to the examiners' report were heard and rejected by the Commission which issued its report[5] November 17, 1949. The Commission said (p. 177):

"We find that concerted prohibition against the payment of brokerage results in detriment to the commerce of the United States in that it has had and will have a serious effect upon the forwarding industry. We are not impressed with the argument that removal of the ban against the payment of brokerage necessarily will result in increases in rates. Respondents should remove all such prohibitions whether contained in their basic conference agreements, the rules and regulations of their tariffs, or both.

"Nothing herein is to be construed as a directive that individual carriers must pay brokerage nor as any limitation as to the amount of brokerage that may be paid by such individual carriers, provided the payments do not result in violations of applicable statutes. A carrier should be free within limits to pay brokerage or not as its individual managerial discretion dictates. Nor is anything herein to be construed as a prohibition against carriers, acting under

commission, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.

"Every agreement, modification, or cancellation lawful under this section shall be excepted from the provisions of sections 1-11 and 15 of Title 15, and amendments and Acts supplementary thereto.

"Whoever violates any provision of this section shall be liable to a penalty of $1,000 for each day such violation continues, to be recovered by the United States in a civil action."

2. Federal Maritime Board was established as the successor to the United States Maritime Commission by Reorganization Plan No. 21 of 1950, 15 F.R. 3178, 5 U. S.C.A. following section 133z–15, and was substituted for the Commission as a party defendant.

3. " * * * The term 'forwarder' means any person employed by shippers or consignees to dispatch shipments by ocean steamships and to take care of formalities incident thereto." Agreements and Practices Pertaining to Brokerage and Related Matters, 3 U.S.M.C. 170, 172.

4. " * * * 'Brokerage is compensation for securing cargo for the ship.' It is compensation paid by common carriers by water to brokers, including forwarders, and is generally measured in amounts equal to fixed percentages of gross revenues collected by the carriers from shippers who have employed the brokers or forwarders." Agreements and Practices Pertaining to Brokerage, and Related Matters, 3 U.S.M.C. 170, 172.

5. Agreements and Practices Pertaining to Brokerage, and Related Matters, 3 U.S. M.C. 170.

a conference agreement, from establishing all reasonable rules or regulations which will prevent the payment of brokerage under circumstances which would violate the Act, or as a prohibition against such carriers from placing limitations upon the amounts which they may pay. On the other hand, as we have found that a prohibition against any payment of brokerage results in detriment to the commerce of the United States, we believe that any limitation below 1¼ percent of the freight involved, which is the amount generally paid by carriers in the various trades over a period of years, would circumvent our finding and result in the detriment condemned. * * *

\* \* \* \* \* \*

"No order will be entered at the present time, thus giving respondents an opportunity to take necessary steps to accomplish the removal of the prohibitions condemned."

Plaintiffs, on January 30, 1950, petitioned for reargument and reconsideration. This was denied by the Commission which, on March 8, 1950, ordered "That respondents herein be, and they are hereby directed, within thirty days after the date of this order, to modify their conference agreements, regulations, and tariffs so as to remove the prohibitions condemned."

This is the order presently under attack.

This action was commenced April 6, 1950. Plaintiffs' application for an interlocutory injunction was heard on May 9, 1950, and denied by our order of June 9, 1950, D.C., 90 F.Supp. 554. On June 15, 1950, Mr. Justice Jackson refused to stay the Commission's order pending the appeal from our order.

██ It seems clear to us that there is substantial evidence in the record before the Commission to sustain its findings that

forwarding activities have developed American commerce, that the forwarding industry is an integral part of the commerce of the United States, that forwarders, when earning and collecting brokerage are doing so in return for services to the carrier and that agreements not to pay brokerage result in detriment to the commerce of the United States. Plaintiffs urge, however, that whatever the state of the evidence with regard to other carriers and conferences, there was, as to them and the trades in which they are engaged, no evidence sufficient to support the commission's findings and order.

██ It is true that there is relatively little evidence in the record bearing directly upon plaintiffs' trades. Thus at the outset we have to consider whether evidence relating to the foreign forwarding and carrying industries as a whole may validly be used to support findings and an order affecting these plaintiffs. We believe that it may. It was not necessary to have evidence as to plaintiffs' specific conferences. It was proper for the Commission to make rational inferences from experience in other segments of the industry and to apply them to the segment here involved. This the Commission did.

██ Adoption of plaintiffs' view as to the evidence required to support the Commission would be unreasonable and unrealistic. Lack of evidence relating to their trades may fairly be laid to the existence of the prohibitions against brokerage in their conference agreements. These prohibitions have been in force for some twenty years only by reason of Commission approval. Under § 15 the Commission may disapprove an agreement it has previously approved, and plaintiffs should not be permitted to urge a condition they helped create as a bar to the Commission's reconsideration and disapproval.[6]

---

6. Especially is that so when, as here, that condition is a result of what, absent the Commission's previous approval, might have been an illegal boycott under the Anti-Trust laws. Attorneys for the United States and for the Board strongly maintain that plaintiffs' concerted prohibitions against the payment of broker-

age constitute a boycott which would clearly be in violation of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, were it not for the shelter provided by the Commission's approval. See Mandeville Island Farms, Inc., v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Anderson v. Shipowners As-

The Commission's order directs merely that plaintiffs' agreements not to pay brokerage be eliminated. Individual carriers are left free, subject to their own judgment and the ordinary operation of lawful competition, to pay or not to pay. The Commission's report did not go so far as to state that all agreements relating to the payment of brokerage would be disapproved, although it considered that an agreement to pay less than 1¼ percent would perpetuate the condemned detriment.

Payment of brokerage is not compelled. No more is done than to subject the carriers to normal competitive conditions. It would thus be premature for us to consider whether the Commission could validly order the payment of brokerage and whether the designation of 1¼ percent as the minimum rate for agreements is justified. The order is silent on these subjects, and brokerage payments and the 1¼ percent minimum may never be prescribed.

It may be that competition will force plaintiffs to pay brokerage, but they have no right to be exceptionally sheltered from competition when such sheltering is detrimental to commerce. Brokerage in ocean commerce is not unlawful or against congressional policy, no matter what that policy may be as to domestic commerce.[7]

We see no merit in plaintiffs' assertion that the Commission's order discriminates between shippers. We cannot at this time know that brokerage will be paid as a result of the order, or that if it is paid the burden will be borne by shippers; or that if these eventualities do occur they will result in the discriminations apprehended by plaintiffs. There is no proof, nor can there be, that such discriminations will obtain, and we cannot set aside the order on the basis of a bare prediction, especially since the Commission, an expert body, apparently foresaw no such difficulties.

sociation of Pacific Coast, 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298; United States v. Sugar Institute, Inc., S.D. N.Y., 15 F.Supp. 817 affirmed, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859. However, we do not find it necessary to decide that point.

If, in the future, discriminations occur, it would then be appropriate for the Federal Maritime Board to consider whether brokerage is or is not detrimental to commerce. The possibility of a future finding of detriment cannot, however, invalidate the present order.

Judgment for defendants. Submit decree.

7. In its report on a bill (S. 3467, 74th Cong.) to amend § 16 of the Shipping Act, the House Committee on Merchant Marine and Fisheries said (p. 3): "It is not the intent of this committee that the act shall be construed so as to prohibit the payment by carriers of legitimate brokerage. * * *" H.R.Rep.No.2598, 74th Cong., 2d Sess.