894 F.2d 526
 1990 A.M.C. 836, 1990-1 Trade Cases 68,918
 TAUB, HUMMEL & SCHNALL, INC., and Wedemann & Godknecht,
Inc., On Behalf of Themselves, and All Others Similarly
Situated, and Wedemann & Godknecht, Inc., On Behalf of
Themselves and All Others Similarly Situated, Mohegan
International Corporation, On Behalf of Themselves and All
Others Similarly Situated, Wayne M. Withrow & Co., On Behalf
of Itself and All Others Similarly Situated, Universal
Transcontinental Corporation, On Behalf of Itself and All
Others Similarly Situated, Plaintiffs-Appellants,
v.
ATLANTIC CONTAINER LINE, LTD., et al., Defendants-Appellees.
 No. 28, Docket 89-7136.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 13, 1989.
Decided Jan. 17, 1990.
 
 Gerald H. Ullman, New York City (Olga Boikess, Jonathan D. Shramko, New York City, Jerry S. Cohen, Cohen, Milstein & Hausfeld, Washington, D.C., of counsel) for plaintiffs-appellants.
 Stanley O. Sher, Washington, D.C. (David F. Smith, Dow, Lohnes & Albertson, Washington, D.C.; William Karas, Dale C. Andrews, Steptoe & Johnson, Washington, D.C.; R. Frederic Fisher, Lillick & Charles, San Francisco, Cal.; John C. Fricano, John M. Nannes, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C.; Edwin Longcope, Hill, Betts & Nash, New York City; John G. Ingram, Wade S. Hooker, R. Scott Ervin, Burlingham, Underwood & Lord, New York City; Gary D. Sesser, Haight, Gardner, Poor & Havens, New York City), for defendants-appellees.
 Before LUMBARD, CARDAMONE, and FRIEDMAN,* Circuit Judges.
 FRIEDMAN, Circuit Judge:
 
 
 1
 The question in this case, here on appeal from the United States District Court for the Southern District of New York, is whether the action of the North Atlantic Continental Freight Conference (Conference) and its member shipping lines, in excluding energy and currency adjustment surcharges from the calculation of freight forwarder brokerage compensation, are immune from antitrust liability pursuant to section 15 of the Shipping Act, 1916, 46 U.S.C.App. Sec. 814, p 6 (1982), because such action was authorized under the Conference Agreement that the Federal Maritime Commission (Commission) had approved. The district court held that the Conference has such antitrust immunity, and granted partial summary judgment in favor of the defendants. Taub, Hummel & Schnall, Inc. v. Atlantic Container Line, Ltd., Memorandum Decision, No. 83 Civ. 2222 (CES) (S.D.N.Y. Oct. 9, 1986). The parties then settled the other issues in the case, thus making the partial summary judgment the final judgment in the case. We affirm.
 
 
 2
 * Freight forwarders provide various services in connection with the water transportation of cargo, such as moving cargo from a shipper to the pier and preparing and processing bills of lading, dock receipts, and other shipping documents. 46 U.S.C. Sec. 84lb(e)(1)-(5) (1982). Freight forwarders are paid for their services by both the shipper and the carrier. The carrier's payments, known as brokerage, customarily are calculated as a percentage of the carrier's transportation charge. The tariffs of the Conference provide for brokerage payments to freight forwarders ranging from 2 1/2 to 10 percent of the tariff transportation charges. See, e.g., North Atl. Continental Freight Conference (Conference) Tariff No. FMC-6, Rule 9(B)(2), at 19 (eff. Oct. 1, 1981).
 
 
 3
 Under the Shipping Act, 1916, conference agreements among common carriers by water are required to be filed with the Commission. 46 U.S.C.App. Sec. 814, p 1. Such agreements may authorize "fixing or regulating transportation rates." Id. The Commission is directed to "disapprove, cancel or modify any agreement ... that it finds to be unjustly discriminatory or unfair ... or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter ...," and to "approve all other agreements...." Id. at p 2. Agreements or modifications that the Commission has approved are exempt from the antitrust laws. Id. at p 6.
 
 
 4
 During the period involved in this case, the Conference acted under an agreement approved by the Commission. FMC Agreement No. 9214. Article VI of that agreement authorized the members of the Conference to
 
 
 5
 agree on amounts of brokerage and forwarders' fees and conditions for the payment of brokerage and forwarders' fees.
 
 
 6
 Id., art. VI, p 6.
 
 
 7
 As noted, the Conference's tariffs have included provisions specifying the amount of brokerage the Conference members will pay to freight forwarders. See, e.g., Conference Tariff No. FMC-6, Rule 9.
 
 
 8
 In 1971, the Conference imposed two separate charges upon shippers--an energy surcharge (also known as a fuel or bunker surcharge) and a currency adjustment surcharge--and provided in its tariffs that brokerage would not be paid upon those two items. See Conference Tariff No. 28, FMC-3, Rule 4(j) (eff. Jan. 17, 1971) (fuel supplemental charge) & Rule 14(B)(4)(e) (eff. Nov. 5, 1971) (currency adjustment). According to the appellees' brief, the surcharges were intended "to recover, in some measure, costs associated with increased or rapidly fluctuating expenses." The parties stipulated in 1984 that although the tariff provision excluding these surcharges remains in effect, the Conference imposed no currency surcharges since June 3, 1981, and no energy surcharges since October 1, 1981.
 
 
 9
 In 1981, while the surcharges still were being collected, an association of freight forwarders filed with the Commission a petition that the agency "investigate the allegedly unlawful [practice by the Conference and two other conferences] of prohibiting the payment of freight forwarder compensation on [energy] and currency adjustment surcharges." National Customs Brokers & Forwarders Ass'n, Order Denying Petition, 21 Shipping Reg. (P & F) 947, 947 (F.M.C.1982) (footnote omitted). The Commission denied the petition, stating that "[t]he conferences named in the Petition all appear to have the authority in their Commission-approved agreements to regulate the amount of compensation their member lines may pay forwarders." Id. at 949.
 
 
 10
 The freight forwarders then filed the present suit against the Conference and its members and against three other conferences. The suit charged the conferences with violating the antitrust laws by prohibiting the payment of brokerage on the energy and currency surcharges. It asserted that the Conference Agreement did not authorize the prohibition, and that the Commission's approval of the agreement therefore had not given the Conference antitrust immunity.
 
 
 11
 The parties stipulated that the decision on the antitrust immunity of the Conference would also bind the three other conferences. Each side filed a motion for partial summary judgment on the issue. The district court granted partial summary judgment for the appellees.
 
 
 12
 The court held that the Conference Agreement "confers antitrust immunity upon the agreement of [the Conference] member lines to exclude [energy] and currency surcharges from the calculation of freight forwarder compensation...." Taub, Hummel & Schnall, Inc. v. Atlantic Container Line, Ltd., slip op. at 5. It noted that under the Commission-approved Conference Agreement, Conference members "had the authority to 'agree on amounts of brokerage and forwarders' fees.' Because [the Conference] member lines had the authority to regulate the amount of compensation to be paid to the forwarders, separate section 15 approval was not required for the agreement, as embodied in the [Conference's] tariff, to prohibit payment of compensation on [energy] and currency surcharges." Id. at 3.II
 
 
 13
 There is a preliminary question about which statute governs this case. In 1984, in the Shipping Act of 1984, Pub.L. No. 98-237, 98 Stat. 67, codified at 46 U.S.C.App. Secs. 1701 et seq. (Supp. V 1987) (1984 Act), Congress significantly changed the provisions of the Shipping Act, 1916. The appellants contend that the 1984 Act rather than the 1916 Act controls.
 
 
 14
 Quoting the general rule that "a new statute applies to cases pending on the date of its enactment," California Cartage Co., Inc. v. United States, 802 F.2d 353, 357 (9th Cir.1986) (citing Bradley v. School Bd. of City of Richmond, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)), the appellants point out that the 1984 Act became effective on June 18, 1984. See Pub.L. No. 98-237, Sec. 21, 98 Stat. 90, codified at 46 U.S.C.App. Sec. 1701 note (Supp. V 1987). They note that this suit, filed in 1983, was pending on the effective date of the 1984 Act and that the judgment of the district court was entered on October 8, 1986, more than two years after that effective date.
 
 
 15
 The very rule upon which the appellants rely, however, contains a critical exception that applies in this case. In Bradley, the Supreme Court stated "that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016. See also California Cartage Co., 802 F.2d at 357.
 
 
 16
 The 1984 Act contains a savings provision, which states in pertinent part:
 
 
 17
 This Act and the amendments made by it shall not affect any suit--(A) filed before the date of enactment of this Act....
 
 
 18
 Pub.L. No. 98-237, Sec. 20(e)(2), 98 Stat. 90, codified at 46 U.S.C.App. Sec. 1719(e)(2)(Supp. V 1987).
 
 
 19
 Since the present suit was filed before the date of enactment of the 1984 Act, the latter Act by its own terms does not apply here.
 
 
 20
 The appellants attempt to avoid the plain meaning of the statute by arguing that the House Committee reports on the bill indicate that the savings provision "simply preserves the treble damage remedy otherwise prohibited" by the 1984 law. Apart from the fact that the language of the savings provision is so clear as to make resort to the legislative history seemingly unnecessary, see Hallstrom v. Tillamook County, --- U.S. ----, ----, 110 S.Ct. 304, 308-11, 107 L.Ed.2d 237 (1989), the Committee reports do not sustain the appellants' contention.
 
 
 21
 The appellants rely upon the following passage in the House Committee report:
 
 
 22
 The other savings provision [section (e)(2) ] is intended to preserve the rights of parties to lawsuits that are filed before the date of enactment. Since section 7(a)(7) of the bill makes the antitrust laws inapplicable to any agreement, modification, or cancellation that was approved by the Federal Maritime Commission under present law, there were some who thought this would adversely affect pending lawsuits. The intent of this savings provision is to permit such suits to continue to conclusion as if the legislation were never enacted.
 
 
 23
 H.R.Rep. No. 53, pt. I, 98th Cong., 1st Sess. 39 (1983), reprinted in 1984 U.S.Code Cong. & Admin.News 167, 204.
 
 
 24
 The House Subcommittee then amended that provision
 
 
 25
 to make clear that, with respect to conduct occurring before the date of enactment of this bill, all remedies available at the time of the conduct will remain available after enactment. This change was made in response to testimony expressing concern that the operation of section 7(a)(7) could lead to denying persons injured under existing agreements the relief available under the law in effect at the time the conduct occurred. Section 7(a)(7) will alter the rights and remedies of the parties only with respect to conduct occurring after the date of enactment.
 
 
 26
 H.R.Rep. No. 53, pt. II, 98th Cong., 1st Sess. 36 (1983), reprinted in 1984 U.S.Code Cong. & Admin.News 221, 256.
 
 
 27
 Although these passages reflect the intention of the House (but not necessarily of the Senate) to preserve antitrust rights and remedies (not just remedies as the appellants contend) available for conduct that occurred before the enactment of the 1984 Act, the savings provision in the statute as enacted did not have the limited scope appellants urge. Instead, Congress adopted a broad provision that made the 1984 Act inapplicable to "any suit ... filed before the date of enactment of this act...." 46 U.S.C.App. Sec. 1719(e)(2).
 
 
 28
 The validity of the appellants' antitrust claims turns upon the authority of the Conference under its Commission-approved agreement to adopt the limitations on brokerage payments it promulgated in 1971. That authority in turn depended upon the Shipping Act as it stood when the Conference acted.
 
 
 29
 The appellants point out that in California Cartage, the court held this savings provision inapplicable to the Commission ruling there challenged. The reason for that decision, however, was that the "lawsuit savings provision of the Shipping Act of 1984, 46 U.S.C. [App.] Sec. 1719(e)(2), applies only to court actions and not to pending administrative cases." 802 F.2d at 357. Here we deal with a court action, to which the savings provision applies.
 
 III
 
 30
 We agree with the district court that the Commission-approved Conference Agreement authorized the Conference's prohibition against the payment of brokerage on the energy and currency adjustment surcharges, and that the prohibition therefore was exempt from antitrust liability. Cf. Volkswagenwerk Aktiengesellschaft v. Federal Maritime Comm'n, 390 U.S. 261, 271, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).
 
 
 31
 A. As noted, article VI of the Conference Agreement authorized Conference members to agree on "amounts of brokerage and forwarder's fees and conditions for the payment of" brokerage and fees. FMC Agreement No. 9214, art. VI, p 6. The prohibition against the payment of brokerage on the energy and currency adjustment surcharges was an agreement on the "amounts of brokerage" and on the "conditions for the payment of" brokerage fees.
 
 
 32
 The determination of the amount of brokerage under the Conference tariffs involves a two-step calculation. First, the total shipping charges upon which the brokerage is to be paid must be ascertained. Second, the percentage figure of brokerage to be paid must be applied to the covered charges. The agreement among the Conference members to exclude the energy and currency adjustment surcharges, which are part of the shipping charges, from the base upon which the brokerage payments are calculated, is an agreement on the "amounts of brokerage" to be paid. It is also an agreement on the "conditions for the payment" of brokerage, since it excludes from the base specified portions of the total transportation charge.
 
 
 33
 This conclusion is consistent with and supported by the Commission's decision, described in part I of this opinion, not to institute an investigation into the legality of the Conference's practice "of prohibiting the payment of freight forwarder compensation on [energy] and currency adjustment surcharges." 21 Shipping Reg. (P & F) at 947 (footnote omitted). In its order, the Commission stated that the conferences "appear to have the authority in their Commission-approved agreements to regulate the amount of compensation their member lines may pay forwarders." Id. at 949. Although the Commission did not specifically refer to brokerage in this statement, in view of the issue before the agency, the statement necessarily dealt with the limitations upon the payment of brokerage that the freight forwarders requested the Commission to investigate.
 
 
 34
 The appellants assert that the Conference practice constitutes a "prohibition" on the payment of brokerage which, they argue, the Commission has determined is beyond a conference's authority under a Commission-approved conference agreement. As the appellees pointed out at oral argument, however, there is no prohibition upon the payment of any brokerage, because the Conference members continue to pay brokerage upon every shipment for which a freight forwarder provides services. The practice merely limits the amount of brokerage paid and does not prohibit the payment of all brokerage.
 
 
 35
 Finally, the appellants contend that if the Conference Agreement authorizes the members to exclude these surcharges from the base upon which they calculate brokerage, they could easily also exclude other portions of the tariff charges from the base. Ultimately, according to the appellants, the Conference members could thereby deny the payment of brokerage upon a major portion of the total shipping charge.
 
 
 36
 This argument is based wholly upon conjecture and speculation and provides no ground for our invalidating the Conference practice. There is no indication that the Conference intends, or even contemplates, to initiate such a practice. The ban on the payment of brokerage upon the two surcharges here involved appears to have been a temporary expedient the Conference took to deal with the unusual circumstances of rapidly escalating cost of energy and rapidly fluctuating currency exchange rates that existed in the 1970's resulting in the surcharges. As noted, imposition of these surcharges terminated in 1981.
 
 
 37
 If the Conference ever were to do what the appellants fear it may do, the appellants' remedy would be to file with the Commission a complaint against the Conference challenging the practice. Atlantic & Gulf/W. Coast of Cent. Am. & Mex. Conference v. United States, 94 F.Supp. 138, 142 (S.D.N.Y.1950). See 46 U.S.C.App. Sec. 1710(a) (Supp. V 1987). See also National Customs Brokers & Forwarders Ass'n, 21 Shipping Reg. (P & F) at 949.
 
 
 38
 B. The appellants further contend that if the Conference Agreement authorizes the exclusion of the two surcharges from the base upon which brokerage is calculated, then the agreement itself to that extent would be "detrimental to the commerce of the United States."
 
 
 39
 1. It is doubtful whether the argument properly is before us at all. It would seem that the contention should have been presented initially to the Commission and not to a court.
 
 
 40
 The statutory scheme of the Shipping Act is that conferences must file with the Commission all agreements "fixing or regulating transportation rates," and that the Commission is to disapprove any such agreement "whether or not previously approved by it, that it finds ... to operate to the detriment of the commerce of the United States." 46 U.S.C.App. Sec. 814, pp 1 & 2. The determination whether provisions of a particular conference agreement will operate to the detriment of United States commerce is one that calls for the application of the Commission's expertise and lies particularly within that agency's discretion. Cf. Far East Conference v. United States, 342 U.S. 570, 574-75, 72 S.Ct. 492, 494-95, 96 L.Ed. 576 (1952).
 
 
 41
 The proper procedure for the appellants to have followed to raise this issue would have been for them to have filed a complaint with the Commission against the Conference and its members and then, if the Commission held against them, to have sought judicial review of that decision. In that way, the reviewing court would have had the benefit of the Commission's expert judgment in resolving the statutory issue. The appellants' present attempt to obtain a judicial resolution of the question in an endeavor to avoid the defense of antitrust immunity that otherwise covered the Conference's action taken pursuant to a Commission-approved conference agreement, requires us to decide the question without the benefit of the Commission's expertise.
 
 
 42
 2. In any event, the argument is unconvincing.
 
 
 43
 When the Commission approved the Conference Agreement, necessarily it determined that the agreement, including its authorization to the Conference members to agree upon the "amounts of brokerage" and the "conditions for the payment of brokerage," would not be detrimental to the commerce of the United States. We have held that the Conference Agreement authorizes the Conference members to exclude the energy and currency adjustment surcharges from the base upon which they calculate brokerage. This being so, it is difficult to comprehend how that exclusion could be detrimental to United States commerce.
 
 
 44
 The appellants contend, however, that two decisions of the predecessor agencies of the Federal Maritime Commission--the United States Maritime Commission and the Federal Maritime Board--establish that the Conference Agreement prohibiting brokerage on the two surcharges would be detrimental to United States commerce.
 
 
 45
 In the first decision, Agreements & Practices Pertaining to Brokerage, 3 U.S.M.C. 170 (1949), the Maritime Commission considered the validity of a conference agreement that prohibited members from paying brokerage on cargo originating from a specific geographical location, and limited brokerage to 1 1/4 percent of the charges on traffic originating from another geographical location. The Commission concluded that a "concerted prohibition against the payment of brokerage results in detriment to the commerce of the United States in that it has had and will have a serious effect upon the forwarding industry." 3 U.S.M.C. at 177. The Commission ordered the conferences to "remove all such prohibitions whether contained in their basic conference agreements, the rules and regulations of their tariffs, or both." Id. The Commission further stated: "we believe that any limitation below 1 1/4 percent of the freight involved, which is the amount generally paid by carriers in the various trades over a period of years, would circumvent our finding and result in the detriment condemned." Id.
 
 
 46
 The Maritime Commission's decision in Agreements & Practices was affirmed as supported by substantial evidence by three-judge district courts in New York and California. Atlantic & Gulf/W. Coast of Cent. Am. & Mex. Conference v. United States, 94 F.Supp. at 141; Pacific Westbound Conference v. United States, 94 F.Supp. 649, 650 (N.D.Calif.1950).
 
 
 47
 In the second decision, Joint Comm. of Foreign Freight Forwarders Ass'n v. Pacific Westbound Conference, 4 F.M.B. 166 (1953), the Maritime Board considered challenges by freight forwarders to a conference tariff that prohibited the payment of brokerage upon heavy lift and long length charges, which were assessed "in addition to the tariff rate on the individual items.... The conference members [paid] brokerage at the rate of 1 1/4 percent to the forwarders and brokers on the basic rate but not on the extra charges." Joint Committee, 1953 Am. Maritime Cases 261, 265 (Jan. 15, 1953) (Examiner's Report).
 
 
 48
 The Maritime Board held that excluding the heavy lift and long length charges from the calculation of brokerage would violate its earlier order in Agreements & Practices because "[t]he record show[ed] that limitations upon the amount of brokerage payable in accordance with the schedule set forth ... are in every case less than 1 1/4 percent of the freight involved," 4 F.M.B. at 169, and because "the special charges named are part of the total freight charges on which brokerage may not be prohibited or reduced below 1 1/4 percent by the conference tariffs. This ruling is not contrary to the customary practice, for, according to the evidence, where the conference members pay brokerage without question on overland traffic, brokerage is paid on 'heavy lift' and 'long length' as well as basic freight charges." Joint Committee, 4 F.M.B. at 171.
 
 
 49
 Read together, those two cases stand only for the proposition that the Commission may find that payment of brokerage below the traditional minimum of 1 1/4 percent would be detrimental to U.S. commerce. Cf. Anglo-Canadian Shipping Co. v. Federal Maritime Comm'n, 310 F.2d 606, 618 (9th Cir.1962). ("[W]e raise no question as to the right of the Commission to make a determination that a complete prohibition of payment of brokerage to freight forwarders would be detrimental to the commerce of the United States; but when it comes to placing a precise and definite limitation upon the power of a conference to fix a maximum for its members, we think that such determination must be based upon facts and findings."). Those cases do not establish that the Conference's prohibition upon the payment of brokerage on the energy and currency adjustment surcharges would necessarily be detrimental to the commerce of the United States. Here there is no showing, or even claim, that the brokerage would be less than 1 1/4 percent of the total freight charge.
 
 The judgment of the district court is
 
 50
 affirmed.
 
 
 
 *
 Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by designation